**Eleanore Higginbotham ARETZ,
Plaintiff-Appellee,**

v.

**UNITED STATES of America,
Defendant-Appellant.**

**Thomas F. ARETZ, Plaintiff-Appellee,**

v.

**UNITED STATES of America,
Defendant-Appellant.**

No. 78–3615.

United States Court of Appeals,
Fifth Circuit.

Oct. 15, 1979.

418

■■■■■■

■■■■■■

Edmund A. Booth, Jr., Asst. U. S. Atty., Augusta, Ga., Neil R. Peterson, Atty., Sp. Litigation, James P. Klapps, Atty., Dept. of Justice Civ. Div., Torts Section, Washington, D. C., for the U.S.

Frank P. Brannen, Perry Brannen, Jr., Savannah, Ga., for plaintiff-appellee.

James H. Ammerman, Marshall, Tex., for intervenors Jean Marie Thomas et al.

■■■■■■

Before TUTTLE, GODBOLD and RUBIN, Circuit Judges.

TUTTLE, Circuit Judge:

On February 3, 1971, fire broke out in Building M–132 of the Thiokol Chemical Corporation's Woodbine, Georgia, plant, where Thiokol was manufacturing flares used for nighttime illumination in the Vietnam War. The fire spread quickly and reached a room where loose, intensely flammable, material used in the 'flares was stored. Building M–132 exploded. Fifty employees were injured, twenty-nine were killed.

Thiokol was manufacturing the flares under a contract with the United States Army according to Army specifications and certain Army manufacturing standards. These included a system for classifying materials produced in arms manufacture according to their hazardousness. The illuminant material which caused the explosion was classified only as a fire hazard, not as an explosive. Deciding that this classification inadequately reflected the danger of an explosion, the Army raised the classification of illuminant from fire hazard to explosive three months before the explosion at Woodbine. Inexplicably, this change was never communicated to the Army procurement officials who supervised the Thiokol contract or to Thiokol. Instead, the directive ordering the change appears to have remained in a desk drawer until after the accident.

This case was brought by one of those injured and his wife. It is the test case of twenty-five brought against the United States [1] under the Federal Tort Claims Act [2] alleging that the negligence of Army procurement employees proximately caused the catastrophe at Woodbine and seeking aggregate damages of $717,526,391. The consolidated trial was bifurcated; the district court first heard evidence on liability alone in all twenty-five cases. The court found that the illuminant used in the manufacture of trip flares at Woodbine was wrongly classified and that employees of the Army were negligent in failing to communicate the Army's change in classification to Thiokol. This negligence, the district court held, was a proximate cause of the explosion. The present case then proceeded on the issue of damages and the court granted final judgment for the plaintiffs.

The United States appeals. We have expedited the appeal and granted leave to the plaintiffs in the cases still pending to intervene as appellees. We are presented with the government's contentions that there is no theory of negligence in this case which is consistent with limitations which the Tort Claims Act places on the United States' consent to suit for the torts of government employees, and that the district court was clearly erroneous in finding that the acts or omissions of government employees were a proximate cause of the explosion.

I.

A

The fire which caused the explosion at Woodbine traveled along the flare assembly

---

1. The suit initially was brought against Thiokol also. Thiokol, however, was covered by workmen's compensation insurance. Georgia law provides that workmen's compensation is the exclusive remedy against an employer, Ga. Code Ann. § 114–103, and Thiokol was there-

fore dismissed as a defendant. *Massey v. Thiokol Chemical Corp.*, 368 F.Supp. 668 (S.D. Ga.1973).

2. 28 U.S.C. §§ 1346(b), 2671 *et seq.*

line and fed on several materials used in the flares. Since causation is one issue before us, an understanding of the flare manufacturing process is relevant.

Both production of the materials used in the flares and assembly of the flares took place in Building M–132. The illuminant composition, a compound of sodium nitrate and brilliant-burning magnesium with a binder, was the principal ingredient of the flare. It was mixed in 500 pound batches, then twice granulated, spread on trays, and placed in the "cure room" for curing at 110° Fahrenheit. After the second curing, the illuminant was pressed into pellets. Also prepared in Building M–132 was the "first fire" material, a highly inflammable pyrotechnic compound used in the flares to ignite the illuminant. This material was prepared in small quantities by a similar process of screening, grinding and curing.

The flares were assembled in two stages. The first stage was the preparation of ignition pellets. On an assembly line conveyer, metal dies first were filled with illuminant. Then they proceeded on the conveyer belt to the "first fire addition station;" there one worker would remove a die from the belt and place it on a plywood board; another would pour first fire material into the die from a volumetric plastic scoop. The dies then returned to the belt and the materials were pressed into ignition pellets in the dies and ejected. The second step, the assembly of the ignition pellets and other compounds into flares, took place on another assembly line. At the head of the line

were placed illuminant cases. Into these three illuminant pellets and an ignition pellet were placed. These candles were then covered to complete the flare.

B

The day of the catastrophe at Building M–132 is remembered as "Black Wednesday" at Woodbine. Shortly before 11:00 a. m., a fire broke out at the first fire addition station. The precise reason for the fire is unknown. It appears, however, to have been caused by friction or impact in the handling of the dies. The operator who poured first fire material into the dies on the plywood board said that fire seemed to come "right from the board itself." Fires are considered a normal hazard in pyrotechnic production, and there had been small fires on the ignition pellet assembly line at Woodbine during the preceding two months.

This time, the fire spread in a flash chain reaction. The fire traveled along the first fire assembly conveyer from die to die, then spread to an accumulation of ignition pellets at the end of the line. From there it traveled along a corridor, igniting an accumulation of 100 ignition pellets, then a rack of trayed illuminant, then several cans of illuminant pellets. Finally, the fire reached the door of the cure room.[3] Inside were 50 pounds of first fire material, 50 pounds of an intermediate mix, 1400 pounds of ignition pellets, and 8,000 pounds of trayed illuminant. The illuminant deflagrated,[4]

---

**3.** It is not known whether the door to the cure room was open, whether pressure from the fire or an explosion outside the door blew open the door, or whether the heat outside the door ignited the materials inside.

**4.** Deflagration is:

> A rapid chemical reaction in which the output of heat is sufficient to enable the reaction to proceed and be accelerated without input of heat from another source. Deflagration is a surface phenomenon with the reaction products flowing away from the unreacted material along the surface at subsonic velocity. The effect of a true deflagration under confinement is an explosion. The confinement of a reaction increases pressure,

rate of reaction and temperature, and may cause transition into a detonation.

DOD Ammunition and Explosives Safety Standards ¶ 3–12 (1969).

Deflagration is distinguished from detonation, which is defined as:

> A violent chemical reaction within a chemical compound or mechanical mixture evolving heat and pressures. A detonation, in contradistinction to deflagration, is the reaction which proceeds through the reacted material toward the unreacted material at supersonic velocity. The result of the chemical reaction is exertion of extremely high pressures on the surrounding medium forming a propagating shock wave which is originally of supersonic velocity. A detonation, when the material is located on or near the surface

and almost instantaneously exploded. Building M–132 was destroyed.

Three to four minutes elapsed from the time fire first broke out at the first fire addition station to the time of the explosion. All the employees evacuated the building. Thomas Aretz, one of the plaintiffs in this case, made a brief, futile attempt to fight the fire. The employees observed a series of two small explosions and then a massive explosion and a large fireball. The explosion scattered debris as far as 4200 feet. Thomas Aretz was thrown 175 feet. Some employees were killed or injured by the blast, others by the fireball.

A thorough report by a Thiokol investigating team identified three causes of the accident. First, the hazard classification of the illuminant underestimated the danger of an explosion. Second, the materials within Building M–132 were too close together, and operated as a fuse from the first fire addition station to the cure room. And third, the fire protection system in the building was unable to contain the initial fire. An investigation by the Bureau of Alcohol, Tobacco, and Firearms reached similar conclusions.

### C

The manufacture of the flares in Building M–132 was taking place under a contract which Thiokol, as a privately owned, privately operated manufacturer, concluded with the Army on December 12, 1969. It called for the manufacture of 754,000 M49 A1 surface trip mines, subject to Army specifications and procurement regulations.

Pursuant to 32 C.F.R. § 7–104.79, the contract required that Thiokol comply with Department of Defense Contractor's Safety Manual for Ammunition, Explosives and Related Dangerous Materials, DOD 4145.-26M. The purpose of this manual was to prescribe "safe methods, practices, and standards for insuring continuity of production, safe-guarding personnel, and preventing property damage at contractor operated plants." According to the manual "[t]he cardinal principle to be observed in any location or operation involving explosives, ammunition, severe fire hazards or toxic materials is to limit the exposure of a minimum number of personnel, for a minimum time, to a minimum amount of the hazardous material consistent with safe and efficient operation." The manual specified the duties of the procurement officials responsible for administering the contract, the Procuring Contracting Officer (PCO) and the Administrative Contracting Officer (ACO). Both had responsibility for including in the contract safety clauses and safety data and for taking steps to assure the contractor's compliance with these safety clauses.[5] For

---

of the ground, is normally characterized by a crater.
*Id.,* ¶ 2–17.

5. The manual provided:
 a. The Procuring Contracting Officer (PCO) is responsible for:
 (1) Providing safety clauses and technical safety data in contracts for ammunition, explosives and related dangerous materials, using this manual, in whole or in part as appropriate.
 (2) Seeking counsel or advice of the cognizant DoD Component safety staff to insure that adequate safety criteria is [sic] included in the contract.
 (3) Having pre-award safety surveys conducted to determine that the contractors can meet the applicable criteria contained herein.
 (4) Evaluating conditions found during pre-award surveys of contractors' plants. When the applicable criteria cannot be met, and only upon authority of the cognizant DoD

Component, amend the contract to reflect the authorized waivers or exemptions (see para. 104).
 (5) Requiring the contractor to provide site and construction plans for review under conditions set forth in paragraph 105.
 (6) Taking appropriate action on safety matters reported by the ACO.
 b. The Administrative Contracting Officer (ACO) is responsible for:
 (1) Assuring that the contracts contained safety clauses and technical safety data and that the contractor complies with same; reporting noncompliance to the PCO.
 (2) Seeking advice of the safety organization of the cognizant DoD Component on matters relating to safety.
 (3) Performing pre-award safety surveys when requested by the PCO.
 (4) Forwarding requests for waivers or exemptions in accordance with para. 104, with appropriate recommendations.

plants owned and operated by the contractor, the manual provided, "it is the responsibility of the Procuring Contracting Officer to determine the acceptable protection after considering the hazard involved and the risk that must be assumed."

An Army regulation, AMC 385–17 (April 15, 1969), required the PCO to insure the "specification of hazard classifications of end items and pertinent safety standards . . . ." "End items" were finished flares, as distinguished from "in process items." In addition to these supervisors, a Contracting Officer's Representative (COR) was stationed at the Woodbine plant. Although his principal duties concerned quality control, he could observe safety violations and either request the contractor to remedy the violations or report them to the ACO. The ACO in turn could order government personnel out of the plant if compliance was not achieved; this would have the effect of shutting down production. Ultimately, the PCO could terminate the contract for default if the employer did not cooperate.

The manual imposed certain specific safety duties on Thiokol as the contractor. In general, it required that Thiokol comply with the terms of the contract; by reference, this would include compliance with hazard classification system discussed below, at least with respect to completed products. The contract also required Thiokol to develop and implement a safety program to protect its personnel, property, and the general public, and to designate a person responsible for administering this program.

Also contained in the manual was the DOD's hazard classification system, discussed in greater detail below. An "Alert Sheet" attached to the contract defined the hazard classification for end item flares for transportation and storage purposes as Class 2. The contract also had attached a technical data package which contained the general specifications for the trip flare and its contents, described the manufacturing process to be used, and specified quality control criteria and tests.

Pursuant to 32 C.F.R. § 7–104.79, which required integration into the contract of DOD 4145.26M, the contract also contained two clauses with respect to the government's safety obligations:

(d) Neither the requirements of this clause nor any act or failure to act by the Government in surveillance or enforcement thereof shall affect or relieve the contractor of responsibility for the safety of his personnel and his property and for the safety of the general public in connection with the performance of this contract, or impose or add to any liability of the Government for such safety. The Contractor is not entitled to rely on the requirements of this clause or on any Government surveillance or enforcement thereof, or lack thereof, or granting of any waiver or exemption in accordance with DOD 4145.26M in discharging the Contractor's responsibility.

(f) The requirements of this clause are minimum requirements. The Contractor agrees that he, and not the Government is responsible for the safety of his personnel and property, and that of the general public, in accordance with the performance of this contract, and that he is not entitled to rely on the requirements of this clause, or any Government surveillance or enforcement thereof, in discharging his responsibility or to impose liability of any kind on the Government.

The office which procured the contract with Thiokol was the Picatinny Arsenal in New Jersey, the central facility for the administration of Army contracts at privately owned, privately operated plants, commanded by a full general and staffed by 700 employees. Picatinny was a division of the Munitions Command (MUCOM), in turn a division of the Army Material Command (AMC) of the Department of the Army. Assisting the Picatinny Arsenal was the regional office of the Defense Contract Administration Service (DCASR) in Atlanta. DCASR is a joint service organization in the Department of Defense which administers military procurement contracts in the field.

The Procuring Contracting Officer for the Thiokol contract was from Picatinny, the Administrative Contracting Officer from DCASR. After Thiokol submitted the low bid for the government's trip flare contract, the PCO via the DCASR conducted a pre-award safety survey on October 28, 1969. Following this inspection, DCASR recommended approval of the contract award to Thiokol and the contract was let out as of December 2, 1969. Once the contract was in effect, the ACO had the responsibility for an annual safety survey, conducted in January, 1971. At that time, conditions in Building M–132 were the same as on the day of the explosion. The DCASR also conducted safety surveys in the building in connection with other defense contracts.

### D

The hazard classification system under which the manufacture of flares in Building M–132 was operating was set out in the Department of Defense Manual, DOD 4145.26M, integrated into the Army-Thiokol contract. This system governed the quantity-distance requirements for the storage and handling of end items, that is the required distances between the location of manufacture and inhabited buildings or public ways.[6] They also determined the maximum quantities of end products which may be stored or transported together.[7]

Thiokol's contract with the Army provided that the illuminant used in the manufacture of the flares was a Class 2 hazard. Class 2 hazards are defined as

[i]tems which burn vigorously with little or no possibility of extinguishment in storage situations. . . . Explosions normally will be confined to pressure ruptures of containers and will not produce propagating shock waves or damaging blast pressure beyond the magazine distances specified by this class. There may be a severe hazard of the spread of fire from tossing about container materials, burning propellant, or incendiary materials. Toxic effects normally will not exist beyond the inhabited building distances specified for this class.

This classification is distinguished for the purposes of this case from Class 7 hazards:

[i]tems . . . most of the entire quantity of which will explode virtually instantaneously when a small portion is subject to fire, to severe concussion or impact, to the impulse of an initiating agent, or to the effect of a considerable discharge of energy from without. Such an explosion normally will cause severe structural damage to adjacent objects and the simultaneous explosion of other separated explosives and ammunition placed sufficiently close to the initially-exploding pile.

Whether a substance was classified as a Class 2 or a Class 7 hazard depended on the results of the so called "card-gap" test.[8] Prior to 1967, illuminant was listed as a Class 7 hazard. In 1967, however, card-gap tests of four illuminants, although not exactly the same composition as at Woodbine, indicated that illuminant was not capable of detonation. Accordingly, these illuminants were reclassified as Class 2. The Alert Sheet attached to Thiokol's contract specified that the flares manufactured at Woodbine, at least with respect to the end item

---

6. In the case of Class 2 hazards, as the trip flares were considered, quantities greater than 20,000 pounds must be 190 feet from a public road. For Class 7 hazards, there must be barricades around the buildings and various minimum distances between magazines according to the net weight of explosives stored.

7. DOD 4145.26M ¶ 704(b) provided:
 Where items of different classes are stored together in the same building or location, applicable explosives weight for the total number of items in each explosives class will be added together to determine the total explosives weight. This total explosives weight and tables applicable to the most hazardous class (class requiring the greater separation) shall be used to determine proper safety distances.

8. This test consists of placing a ⅜ inch steel plate at the end of a tube in which the test material is ignited. If the result is a clean hole in the steel plate, the material is deemed to have detonative ability and is classified as Class 7.

storage and transportation, were classified as Class 2.

Tests and research after 1967 indicated that the explosive danger of pyrotechnic compositions such as the illuminant used at Woodbine was greater than indicated by the card-gap test. In 1968, two researches with audiences in the military-industrial complex[9] took specific exception to the Army's classification of pyrotechnics and criticized the card-gap test as unsuitable for determining the explosive capacity of these materials. Their views were borne out by tests conducted by the Wasatch division of Thiokol at an Army Air Force installation in 1968, and by the British Ministry of Defense in 1969. Both of these tests indicated that the rapid deflagration of magnesium-sodium nitrate pyrotechnics similar to the compound used at Woodbine was explosive. The Army itself conducted tests at Picatinny Arsenal, the results of which are not revealed in the record.

In October, 1970, doubts about the classification of illuminants moved Army procurement officials to action. The Chief of Research and Labs at Picatinny Arsenal recommended that "[p]ending completion of the Picatinny Arsenal program for development tests to determine the hazard classification of pyrotechnic compositions, loose pyrotechnic compositions should be considered hazard Class 7." A report accompanying his recommendation was transmitted up through channels to the Munitions Com-

mand and from there to the Commanding General of the U.S. Army Material Command on October 29, 1970.[10]

On November 16, 1970, Army Material Command approved the recommendation to classify illuminants as Class 7. Under standard operating procedure, this change would have been communicated to all operating levels of the procurement process. Accordingly, the directive would have been sent to Thiokol, with a copy to DCASR in Atlanta.

Instead, nothing happened. Not until February 25, 1971, three weeks after the explosion, did the Commanding Officer of Picatinny inform the General Manager of Thiokol-Woodbine that on an interim basis "it is recommended" that loose illuminant be reclassified as Class 7. Only on March 25, 1971, was Thiokol notified that all pyrotechnic materials, in storage or in process, "*must* be considered as explosive Hazard Class 7 . . ." (emphasis added). It is not clear what happened between November 16 and February 25. But the upgrading order was found in the desk drawer of an officer of Picatinny's research lab some time after the explosion in Building M–132.

### E

In ruling that the United States was liable for damages stemming from the explosion at Building M–132, the district court focused on the Department of Defense hazard classification system. "No one can re-

---

**9.** Dr. Joseph H. McLain appeared as a witness for the plaintiffs. A doctor of chemistry, McLain was experienced in pyrotechnic and explosive manufacture and was considered a leading expert in the field. In 1968 and for some time thereafter he conducted seminars at the Franklin Institute in Philadelphia attended by government and military personnel.

J. E. Settles was manager of safety of the Chemical Propulsion Division of Hercules, Inc. at Wilmington, Delaware and author of *Deficiencies in the Testing and Classification of Dangerous Materials*, 1 Annals N.Y.Acad. Science 199 (1968).

**10.** The report stated in pertinent part:
8. It is recommended that pyrotechnic compositions no longer be tested in accordance with the procedures given in Army Bulletin TB 700–2, Chapter 3 [the card-gap test].

It is further recommended that an interim hazard classification of Class 7 be assigned to loose pyrotechnic compositions during handling, storage and transportation, until more meaningful tests can be adopted.

9. Picatinny Arsenal in its hazard classification program is developing a series of tests which will determine the deflagration to detonation characteristics of pyrotechnic compositions. These tests include rates of detonation, confined ignition temperature and pressure-time behavior under heavy confinement. Those compositions which appear to detonate, low to high order, will be tested for TNT equivalency for potential damage assessment. It is believed that the data obtained from these tests will give more meaningful criteria for hazard classification of pyrotechnics.

view the massive record in this case without arriving at the conclusion that the classification of loose, in-process illuminants as Class 2 materials was incorrect and that the card-gap test was inadequate . . . ," the court found. The government in the exercise of ordinary care knew or should have known that loose illuminant presented a danger of explosive effects, and accordingly the government was negligent. The court further stated that it was predicating its finding on the Army's failure to implement its decision to upgrade the classification of pryotechnic materials to Class 7; this failure amounted to "affirmative, negligent acts and omissions on [the government's] part. . . ."

The court found that the causes of the explosion at Woodbine were the inadequate hazard classification of illuminant material and concomitant recognition of the dangers involved, and the location of materials too close to one another and scattered about in Building M–132, permitting the fire to spread to the cure room. Acknowledging Thiokol's negligence in failing to recognize the danger of explosions from illuminant and in storing and handling materials so as to permit the chain reaction, the court nevertheless found that the Army's negligence was a concurring proximate cause of the explosion. Weighing the preponderance of the evidence, the court concluded that if the Army had communicated to Thiokol its decision to upgrade the classification of illu-

minant from Class 2 to Class 7 in accordance with standard operating procedure, Thiokol would have taken steps which could have prevented the sequence of events on Black Wednesday.

## II.

### A

The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq., waives the United States' sovereign immunity for the torts of federal employees by granting the federal district courts jurisdiction over suits for damages "caused by the negligent or wrongful act or omission of any employee of the Government [11] . . . ." The Act also limits the United States' liability in certain respects. Three such limits are relevant in this case.

First, 28 U.S.C. section 2671 provides that the term "federal agency" as used in the jurisdiction-granting provision of the Act "does not include any contractor with the United States." [12] Since the employees for whose torts the United States accepts liability in respondeat superior must be employees of a "federal agency," id., this definition precludes federal liability for the torts of an independent contractor. Logue v. United States, 412 U.S. 521, 526–27, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). The second limitation of concern in this case is closely related to the first. The liability of the United States under the Act is limited

---

11. 28 U.S.C. § 1346(b) provides in full:

Subject to the provisions of [28 U.S.C. §§ 2671 et seq.] of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on or after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. §§ 2671 et seq. in turn define the procedures for Tort Claims Act cases.

12. 28 U.S.C. § 2671 provides in pertinent part:

As used in this chapter and sections 1346(b) and 2401(b) of this title, the term—

"[f]ederal agency" includes the executive departments and independent establishment of the United States, and corporations primarily acting as, instrumentalities or agencies of the United States but does not include any contractor with the United States.

"Employee of the government" includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

by section 1346(b) to the "negligent or wrongful" acts of its employees; this language has been interpreted to preclude liability of the United States based on strict liability in tort. *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). *See also Dalehite v. United States*, 346 U.S. 15, 45, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Either of these limitations forecloses any theory of liability in this case based on some nondelegable duty of the employer of an independent contractor for the performance of hazardous activities. *See Gibson v. United States*, 567 F.2d 1237, 1242–44 (3d Cir. 1977), *cert. denied*, 436 U.S. 925, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978).[13] They do not mean, however, that employment of an independent contractor insulates the United States from liability for its own employees' independent acts of negligence which occur in connection with the work of an independent contractor. *See Logue, supra*, 412 U.S. at 532–33, 93 S.Ct. 2215 (U.S. not liable for negligence of employees of independent contractor, but remand to determine if federal employee was negligent).

The third limitation is the specific exception in section 2680(a) of the Tort Claims Act providing that the government's waiver of sovereign immunity does not extend to claims which arise from a government employee's performance of "a discretionary function or duty."[14] *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) is the leading case involving this exception. Its facts are similar to those of the present case. As part of a program for the export of fertilizer, the government contracted for the manufacture of fertilizer from surplus explosive compounds according to detailed government specifications for manufacture, packaging, labeling, and shipping. An explosion while the packaged fertilizer was being loaded on to ships razed much of Texas City, Texas. The Court held that section 2680(a) put the Tort Claims Act beyond the reach of claims arising from this explosion because the decision to manufacture the fertilizer and the specifications for the manufacture and handling "were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program." *Id.* at 42, 73 S.Ct. at 971. *Dalehite* thus established a distinction between those acts of the government which are "discretionary" within the meaning of section 2680(a) and those which are "operational" and therefore reachable under the Tort Claims Act. Further cases have developed this distinction, and narrowed the scope of what is considered discretionary.[15] In *Indian Towing Co., Inc. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Court held that the owner of a barge which ran aground could sue the United States for the negligence of the Coast Guard in operating a lighthouse because, although the decision to emplace a lighthouse was discretionary, its maintenance once in place was operational.[16] *See also, e. g., Hatahley v. United States*, 351 U.S. 173,

---

13. *Cf. United States v. Praylou*, 208 F.2d 291 (4th Cir. 1953); *Rylands v. Fletcher*, L.R., 3 H.L. 330 (1868); Restatement (Second) of Torts §§ 416, 519, 520 (1965) (variations on theory).

14. 28 U.S.C. § 2680 provides:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

15. *See J. H. Rutter Rex Manufacturing Co., Inc. v. United States*, 515 F.2d 97, 99 (5th Cir. 1975).

16. The Court reasoned:

The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning . .

350 U.S. at 69, 76 S.Ct. at 126–127.

181, 76 S.Ct. 745, 100 L.Ed. 1065 (1956) (impoundment of Indian horses by federal range agents without written notice required by state not discretionary); *Moyer v. Martin Marietta Corp.,* 481 F.2d 585, 595–97 (5th Cir. 1973) (acceptance of aircraft with arguably negligently designed pilot's ejection seat not discretionary); *Seaboard Coastline Railroad Co. v. United States,* 473 F.2d 714, 716 (5th Cir. 1973) (design of drainage ditch which caused railroad derailing not discretionary).

■ Within the framework of these limitations on the scope of the Tort Claims Act, the liability of the United States in this case is consistent with the Act if there was some distinct act (1) of negligence (2) by government employees, which was (3) operational. The district court's theory of liability was founded on the failure by employees of the Army Munitions Command or the Picatinny Arsenal adequately to classify illuminant as a hazard or to timely communicate to Thiokol-Woodbine the upgrade in hazard classification. The court found that Thiokol was an independent contractor, as the plaintiffs have conceded from the first, and expressly disclaimed any theory either of vicarious liability based on the nondelegable duty of the employer of an independent contractor, or of strict or vicarious liability based on the performance of ultrahazardous acts. The court ruled that both the hazard classification program and, at the very least, the communication of the change in the classification of illuminants were operational functions. The court held that the improper classification and the failure to communicate the change in classification were affirmative acts of operational negligence by government employees. The United States would have us hold that the district court's rulings were inconsistent with the limitations on the Tort Claims Act discussed above.

B

■ We begin by considering whether the government was under any duty of care in its hazard classification or in the communication of its change in classification, for

the breach of which it could be found negligent. The source of duty is a matter of state law, 28 U.S.C. § 1346(b); *Watson v. United States,* 346 F.2d 52, 53 (5th Cir. 1965), *cert. denied,* 382 U.S. 976, 86 S.Ct. 544, 15 L.Ed.2d 467 (1966), and the parties agree that Georgia law is applicable here. The district court was vague in identifying the source of the government's duty to communicate. The court made its finding of negligence on the basis of "what is conceived to be a law of Georgia as it would be applied if an analogous case were before the courts of [Georgia]," but did not cite any specific Georgia statutory or common law for this finding.

The government seizes on the absence of citation to argue that there is no such basis. The government sets up three arguable bases and then proceeds to knock them down. First, Ga.Code Ann. § 105–502, which codifies exceptions to the independent contractor rule, does not fit the facts and conflicts with limitations of the Tort Claims Act. Second, the nondelegable duty doctrine also suffers such conflict and extends only to the general public and not employees of the independent contractor. Third, the "Good Samaritan" doctrine, whereby one who gratuitously undertakes to do something on a person's behalf becomes liable to that person for negligence in performing the undertaking, is inapplicable because Thiokol employees did not rely on the government's safety program, and the government made no specific safety undertaking with respect to the employees.

■ These are straw men the government knocks down. They are theories of liability which the district court and the plaintiffs explicitly disclaimed. Furthermore, these attacks are directed towards theories of liability based on some duty which arises from the relationship between the United States and Thiokol as employer and independent contractor. Georgia law, however, recognizes that the employer of an independent contractor may be liable to the employees of the independent contractor for his own wrongful acts. Ga.Code Ann. § 105–502(5); *Huey v. City of Atlanta,*

8 Ga.App. 597, 600, 70 S.E. 71 (1911) ("distinct and independent negligence"); *Johnson v. Western & Atlantic Railroad Co.,* 4 Ga.App. 131, 134–35, 60 S.E. 1023 (1908). Moreover, negligence need not be the breach of some specific relational duty. *See Georgia Railroad & Banking Co. v. Sewell,* 57 Ga.App. 674, 683, 196 S.E. 140 (1938); *compare* Ga.Code Ann. § 105–101 (defining a tort as, *inter alia,* "the violation of a public duty, by reason of which some special damage accrues to the individual") *with id.* § 105–104 (providing a right of action in tort or contract for violation of a specific private duty).

▮ In discussing the government's negligence, the district court cited *Hand v. Harrison,* 99 Ga.App. 429, 108 S.E.2d 814 (1959). The case enunciated, under Georgia law, the common principle of negligence that every person owes a duty of ordinary care not to injure third persons whether or not in some contractual relationship. The existence of the duty is "invariable," *Delta Airlines, Inc. v. Garmon,* 139 Ga.App. 146, 150, 227 S.E.2d 816 (1976), *quoting Wright v. Dilbeck,* 122 Ga.App. 214, 228, 176 S.E.2d 715 (1970). What constitutes ordinary care "varies with the instrumentality dealt with; where it is inherently dangerous, more care is necessary in regard to it than where it is, according to common experience, a thing relatively harmless . . . ." *Id.,* 99 Ga. App. at 432, 108 S.E.2d at 816. *Accord, e. g., Williams v. United States,* 352 F.2d 477, 481 (5th Cir. 1965) (interpreting Georgia law). This Court has called the role of foreseeability in Georgia law as "talismanic." [17]

> [I]n order for a party to be liable as for negligence, it is not necessary that he should have been able to anticipate the particular consequences which ensued. It is sufficient, if in ordinary prudence he might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might result.

*Williams v. Grier,* 196 Ga. 327, 337–38, 26 S.E.2d 698, 705 (1943). *Accord Smith v.*

*American Oil Co.,* 77 Ga.App. 463, 499, 49 S.E.2d 90 (1948). Since foreseeability and ordinary care vary under the circumstances, these are ordinarily questions for the factfinder. *E. g. Gross v. Southern Railway Co.,* 414 F.2d 292, 301 (5th Cir. 1969); *Bussey v. Dawson,* 224 Ga. 191, 193–94, 160 S.E.2d 834 (1968).

▮ In this case the district court found that the government was warned as early as 1968 and knew three months before the accident at Woodbine that the hazard created by pyrotechnic illuminants was seriously underrated by its hazard classification system, that fires were commonplace in pyrotechnic manufacture, that the government knew from its annual safety inspection as well as other precontract safety inspections of Building M–132 the layout and condition in that building, and that the government had general control over the safety standards for handling hazardous materials in the flare manufacturing process at Woodbine. The government's decision that all pyrotechnic compositions "must be considered as Explosive Hazard Class 7 . . ." itself indicates that an explosion such as that which occurred at Woodbine was foreseeable. In the face of this foreseeable risk, we can hardly find that the district court was clearly erroneous in concluding that the standard of ordinary, prudent care gave rise to a duty on the part of the appropriate Army procurement officials to change the classification of illuminant and to timely communicate this change to Thiokol.

### C

Even if there was a basis for negligence, the government argues, liability cannot be imposed consistently with the independent contractor, strict liability, and discretionary function exemptions of the Tort Claims Act. The premise of the government's argument is that the Army's contract with Thiokol gave the latter, as an independent contractor, all responsibility for carrying out the requirements of the contract, including pro-

---

17. *Williams v. United States,* 352 F.2d 477, 481 (5th Cir. 1965).

tecting the safety of Thiokol employees. The effect of imposing liability ·on the government in this case is to create a duty on the part of the United States to supervise and inspect the day-to-day manufacturing process of its defense contractors, a duty which conflicts with the delegation of control reflected in the independent contractor relationship and with the governmental discretion reflected in the decision to structure the procurement program in this way.

Although the imposition of such a duty likely conflicts with the Tort Claims Act, the argument that such a duty is imposed surely conflicts with the record in this case. Nothing in the district court opinion suggests that the court based its finding of negligence on any act or omission of the government in the supervision of Thiokol's manufacture. The only basis of liability which the court found was the improper classification and the failure to communicate the change in classification. It imposes no additional supervisory obligations on the Army procurement machinery to hold that it was negligent for Army officials to fit illuminant compounds into the wrong hazard classification pigeonhole or to fail to communicate a change in classification in a timely manner in accordance with standard operating procedure.

The district court found that both the decision to classify illuminant as Class 2 and the communication of the upgrade in classification were operational within the meaning of the discretionary function exemption of the Tort Claims Act. The government does not contest these findings, and hence we need not consider whether either of these acts was not operational.

The government does, however, raise the argument that the discretionary function exemption broadly shields all its conduct connected with its contract with Thiokol. The government places great reliance on the clause in the contract which disclaimed any alteration by the contract in the government's and the contractor's obligations with respect to the safety of the contractor's employees. The district court

ruled in this connection that, as a matter of public policy, the government and Thiokol could not "deal out" Thiokol's employees. The government contends that this ruling amounted to ruling that the safety of the employees was a nondelegable duty of the government and is inconsistent with the discretionary function exemption because this clause was adopted pursuant to 32 C.F.R. § 7–104.79. Thus, this contractual disclaimer is an integral part of the Army's procurement program and to impose liability despite the disclaimer vitiates the discretionary decision to operate the procurement program without undertaking safety obligations.

As we read the language of the contract as set out in the statement of facts, however, it does not disclaim any existing liability on the part of the government; it merely provides that the safety provisions of the contract do not relieve the contractor of any safety responsibilities toward his employees and do not "impose or add to" the government's liability. Thus, while it indicates that the government undertook no safety duties by the terms of the contract, it does not appear to disclaim any liability which arises outside the contract, as did the government's duty and liability in this case. The Tort Claims Act provides that, within the statutorily delineated limits, the United States shall be liable to the same extent as a private party would be under state law. 28 U.S.C. § 1346(b). Georgia law provides that, although parties to a contract may adjust tort liability among themselves, they cannot by contract relieve themselves from any liability to a third person where otherwise they would be liable. *State Construction Co. v. Johnson*, 88 Ga.App. 651, 657, 77 S.E.2d 240 (1953). Thus, even to the extent that the disclaimer clause on which the government relies might by its terms apply to liability in the present case, it cannot avoid the liability which Georgia law, through the Tort Claims Act, imposes. It is clear that the district court, in ruling that the government and Thiokol could not "deal out" Thiokol's employees, was ruling on this basis. The

Army cannot by regulation or contract displace the liability which Congress has authorized; no more than the courts can accept a tort theory in a Tort Claims Act case which "would be to judicially admit at the back door that which has been legislatively turned away at the front door," *Laird v. Nelms*, 406 U.S. 797, 802, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1975), can the Army hustle out the back door what Congress has admitted at the front.[18]

Accordingly, we hold that imposing liability on the government for its negligence in the continued classification of illuminant as a class 2 hazard and in the failure to inform Thiokol of the change in classification does not offend the Tort Claims Act.

### III.

There remains the question whether the government's negligence proximately caused the explosion at Woodbine from which the plaintiffs' injuries resulted. Under Georgia law, proximate cause is a question for the factfinder. *E. g. Williams v. Kennedy*, 240 Ga. 163, 163, 240 S.E.2d 51 (1977); *Bussey v. Dawson*, 224 Ga. 191, 193, 160 S.E.2d 834 (1968). Thus our review is limited to the question whether the district court was clearly erroneous.

Georgia law defines and limits proximate cause by the scope of foreseeable injury. *See, e. g., Williams v. Grier*, 196 Ga. 327, 337, 26 S.E.2d 698 (1943). One need not anticipate the particular injury or the particular person injured, so long as some injury resulting from the negligent conduct is foreseeable. *Medi-Clean Services, Inc. v.*

*Hill*, 144 Ga.App. 389, 392, 241 S.E.2d 290 (1977); *Harris v. Hardman*, 133 Ga.App. 941, 942, 212 S.E.2d 883 (1975). Since the duty of care in this case also arose from the foreseeability of harm, our affirmance of the district court's finding of negligence by the government also establishes that the government's conduct could constitute proximate cause of the plaintiff's injuries.

The government would have us find as a matter of law that nonetheless Thiokol's negligence was the superseding proximate cause of the explosion because Thiokol stored and processed illuminants casually and itself failed to reclassify illuminants, and even if the government had been prompt in notifying Thiokol of its change in classification, Thiokol would not have changed its handling of the illuminants.

The actual, as distinguished from the legal or proximate cause, of the accident is undisputed. A fire broke out at the first fire station, traveled down the conveyer belt, down through the hallway igniting materials stored there, and burst through the cure room door. The principal causes of this series of events were the inadequate hazard classification of the illuminant materials, and the storage of materials on the assembly line and in the hallways too close together. Thiokol's negligence and the causal relationship of this negligence to the accident are, for present purposes at least, also undisputed.

The district court found that the United States' negligence was a concurring proximate cause.[19] The court narrowly

---

**18.** It reads the discretionary function exemption too broadly to argue that because the decision to adopt the disclaimer as part of Army procurement regulations was discretionary, any safety related liability violates the discretionary function exemption. The exemption applies only to acts or omissions "in the performance of" a discretionary function, 28 U.S.C. § 2680(a). No negligence in deciding to require the disclaimer is alleged. Moreover, "The kind of negligence, not the kind of activity pursued, [is] the test for determining the liability of the United States," *Blaber v. United States*, 332 F.2d 629, 631 (2d Cir. 1964).

Thus, the fact that the negligence may have occurred in connection with a discretionary

function does not make the negligent act a discretionary function. Nor does the discretionary character of the government's initial safety undertakings govern whether a duty can arise out of those undertakings. The Tort Claims Act deals with sovereign immunity— that is, with whether the United States may be sued for certain torts; it does not define what are torts.

**19.** Where two concurrent causes cause an injury, the plaintiff may recover against either or both of the negligent actors. *Mullis v. Chaika*, 118 Ga.App. 11, 15, 162 S.E.2d 448 (1968). It is not a defense for either negligent actor that the other's negligence was a contributing cause if

weighed the preponderance of the evidence, and based its conclusion that notice of a change in classification would have prompted measures by Thiokol which would have reduced the risk of an explosion principally on the testimony of Joseph B. Galloway, Plant Manager of Thiokol-Woodbine. Galloway testified that if he had received the government's directive changing the classification, he would have closed Building M-132 until remedial steps could be taken, in particular removing the cure room to a remote location and reducing the total amount of material in the building "drastically." In addition, the chief of the Munitions Engineering Division of Picatinny Arsenal admitted that the upgrade in the illuminant hazard classification "should prevent the sort of thing that happened at Woodbine." There was considerable evidence that removing the cure room to another location would have prevented the explosion.

The government contends that this evidence is overwhelmingly outweighed by the evidence that Thiokol would have been unwilling to make such changes. In particular, Thiokol was already suffering losses on its trip flare contract to the tune of $1,000,000; thus, the company might have had little disposition to take steps which would have extended the contract and increased its cost. Moreover, on the face of the contract, the government's hazard classification system governed only the end item products and not in-process manufacture. The government further argues that the safety standards were only advisory and not mandatory. This evidence, however, is itself counterweighed. According to the Chief of Procurement at Picatinny Arsenal, the Army would have renegotiated the contract as a result of any change in the hazard classification, which had been attached as part of the original contract. The Army had the power to withdraw the contract if it became dissatisfied with safety arrangements. Although the original hazard classification governed only in-process items, the

directive which Thiokol received on March 25, 1973, indicated that Class 7 treatment was to be given to in-process materials as well; moreover, the district court found that although by the terms of the contract and the classifications the hazard system applied only to end items, in practice it controlled in-process handling as well. Thus, the circumstances gave evidence to support Galloway's testimony that Thiokol would have had "no choice" but to alter its handling of illuminants if it had received the Army's directive and the district court could reasonably conclude that the directive would have had this effect.

The government argues that such a change would have made no difference in view of what was Thiokol's evidently sloppy handling of illuminants and other pyrotechnic materials in Building M-132. The explosion would not have occurred if there had been greater separation between dies on the first fire assembly line and if illuminant materials and parts had not been allowed to accumulate in the hallways of Building M-132. The district court conceded that this was one "but for" cause of the accident. But another such "but for" was the incorrect classification of illuminants and the quantity of illuminants stored in the cure room. While the explosion would not have occurred without either of these, the government's causation of the second was sufficient to make it a contributing cause of the explosion. See note 19, *supra*.

 Even if Thiokol's negligence were an intervening cause, such negligence would not relieve the government of liability. From its precontract safety inspection and its annual safety inspection in 1971, the government knew the layout in Building M-132. Conditions in the building were substantially the same at the time of the DCASR annual safety inspection in January, 1971, as they were at the time of the explosion. As a result, the district court found that Thiokol's negligence was fore-

the injury would not have occurred but for the first actor's negligence. *Medi-Clean Services,*

*Inc. v. Hill,* 144 Ga.App. 389, 391, 241 S.E.2d 290 (1977).

seeable and bore on the foreseeability to the government of the risk of an explosion. The negligence of another party is not an intervening cause if the defendant had "reasonable grounds for apprehending" the intervening negligence. *Milton Bradley Co. of Georgia, Inc. v. Cooper*, 79 Ga.App. 302, 307, 53 S.E.2d 761 (1949).

The government also points to the fact that in the cure room along with the 8,000 pounds of illuminant were 50 pounds of first fire material, 50 pounds of an intermediate mix and 1,400 pounds of ignition pellets. The latter were classified as Class 7 hazards. The DOD Contractors Manual for Ammunition Explosives and Related Dangerous Materials, which set out the standards for handling classified hazards, specified that where hazards are of different classes are stored together, the total weight of such items should be treated as if all the items were of the highest classification.[20] Accordingly, all the items in the cure room should have been treated as Class 7. The district court correctly reasoned, however, that since it was the illuminant and not the materials already classified as Class 7 which caused the explosion, the effect of the improper storage of the materials was, as one witness characterized it, "a squeak in a thunderstorm." By another analogy, one could scarcely argue that driving with broken taillights was the superseding cause of a headon collision.

We cannot find the district court clearly erroneous in concluding that the government's failure to communicate promptly to Thiokol its change in the classification of illuminants was a contributing proximate cause of the explosion which injured Thomas Aretz and other employees at Thiokol-Woodbine.

The judgment is AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, dissenting:

I.

My brethren reach a result that, reduced to the apodictic simplicity of a hornbook, can be restated in two sentences:

A. A person who contracts with a manufacturer to make and supply a product whose manufacture requires special care has a duty to employees of the manufacturer to warn their employer of hazards involved in making the product.

B. If harm results to employees of the manufacturer as a result of the hazardous qualities of the product, such a failure to warn may be the proximate cause of their injury even though the manufacturer knew or should have known of the hazards, provided the contract for making the product required the manufacturer to take special safety precautions and the manufacturer would have observed these procedures if required to do so by the person for whom the product is being made.

Because I cannot concur that the law of Georgia establishes the first proposition, at least in the manner in which it is here applied, and I cannot agree that Georgia or any other jurisdiction would accept the second, I must respectfully dissent.

The two sentence summary does not, I hope, unfairly reflect the views of the majority or distort their studied opinion. As they correctly observe, although suit is brought pursuant to the waiver of sovereign immunity provided by the Federal Tort Claims Act, the claim must be established in accordance with Georgia law. The principles applicable are, therefore, identical whether the contracting purchaser is a private industry or the federal government. They are run-of-the-mill tort principles.

The duty of care that the government is found to have violated is two-fold: a duty properly to classify the substances being used in the manufacturing process and a duty promptly to communicate any change in its own classifications. In discussing whether or not the government (or any other person) owes a duty of care to employees of the manufacturers with whom it

---

**20.** See note 7, *supra.*

contracts, the majority makes it clear that the duties found to exist here are *not* based on any provision of the contract, and the government was not absolved by any contract provision from liability "which arises outside the contract, as did the government's duty and liability in this case." Indeed, under Georgia law, they state, the contracting purchaser (in this case, the government) could not by contract absolve itself from liability to the manufacturer's employees.

The majority opinion expressly disclaims reliance on the contract as the source of the government's duties; not only does the contract expressly negate liability but no breach of the contract was alleged or proved. Yet the contract thus disavowed appears to lurk in the background of the first theory of liability, for the majority states that liability is predicated on "the improper classification [of the product] and the failure to communicate the change in classification." The classification of the illuminant, as the majority opinion stresses, was set forth in the contract itself. It appears, therefore, that the decision does impose liability for the alleged misclassification contained in the contract, and, hence, for liability arising in some way out of the contract.

The other basis of liability, failure to communicate the change in classification, was necessarily post-contractual. After observing that "[t]he district court was vague in identifying the source of the government's duty to communicate," my brethren, I respectfully fear, become victims of the same kind of imprecision. They discuss the source of that duty in three sentences, each of which I set forth separately:

(1) "Georgia law, however, recognizes that the employer of an independent contractor may be liable to employees of the independent contractor for his own wrongful acts." With respect, I must conclude that this begs the question. Of course, employment of an independent contractor does not absolve the employer from liability for *his own wrongful acts*. But what creates the duty to communicate, and what makes failure to communicate *wrongful*?

The destruction of the shield that an independent contractor relationship once provided does not imply the creation of a *duty* to the employees of *every* independent contractor. While broader dicta occasionally appears in their opinions, Georgia courts have actually imposed a duty of care to employees of an independent contractor only in limited situations. Thus, where the employer-contractor engages an independent contractor to do work on his property and affirmatively leads the independent contractor's employees into an unsafe place, he is liable.[1] Liability in this situation is not based merely on a general failure to recognize and communicate danger but on an act of negligence directly involving the employer-contractor with the injured employee. Georgia courts go a step further; they impose liability on a landowner who, without warning, contracts with an independent contractor to bring others on his premises to work on a machine that is known by the landowner to be hazardous.[2]

---

1. In *Johnson v. Western & Atlantic Railroad Co.*, 1908, 4 Ga.App. 131, 60 S.E. 1023, a railroad hired a contractor to repair the roof of a depot owned by the railroad. During the repairs, an employee of the contractor fell from the roof and died. The court stated that generally one who employs an independent contractor is not liable for injuries to workers. Here, however, the defendant had interfered and assumed control by stating to the worker that the roof was safe when the defendant knew or should have known of the defective condition of the roof.

The majority opinion also cites Ga.Code Ann. § 105-502(5) as support for the proposition that Georgia law recognizes liability for the wrongful acts of an employer of an independent contractor. This statute, though, deals with the liability of an employer for the *negligence of a contractor*. Furthermore, subsection (5) requires some interference or control on the part of the employer.

2. In *Huey v. City of Atlanta*, 1911, 8 Ga.App. 597, 70 S.E. 71, an employee of an independent contractor was killed while repairing an engine owned by the city. The court held there was a cause of action for the defendant's failure to warn of the dangerous condition of a machine on city premises. *Cf. Miles v. Vicksburg Chemical Co.*, 5 Cir. 1979, 602 F.2d 683 at 685.

It is not clear whether the duty in such a situation is to warn the workers of the danger or merely to warn their employer so that he can take precautions. In either event, the principle is a familiar one: the landowner owes a duty to attempt to safeguard those who, in coming onto his premises, undergo a risk unknown to them. It does not follow from either of these cases that Georgia would impose a duty of care on every person who contracts with an independent contractor. *Cf.* Restatement (Second) of Torts § 416, which adopts a standard of absolute liability for the contractor's fault.

None of the Georgia cases relied upon by the majority supports the concept that everyone who employs an independent contractor owes a duty to that contractor's employees. That in *some circumstances* Georgia does not view the contract as a wall against liability does not create any inference that Georgia courts would impose a duty in the present situation.

(2) "(N)egligence need not be the breach of some specific rational duty." This is an unexceptionable observation; it tells us what negligence need *not* be; it does not help us to identify the duty of care whose breach is a prerequisite to negligence.

(3) "[E]very person owes a duty of ordinary care not to injure third persons whether or not in some contractual relationship." The contracting purchaser certainly owes a duty *not to injure* the employees of the manufacturer-seller. That, however, is not the duty found to have been violated here; the duty for whose breach liability is found is a duty to tell the manufacturer how to avoid injury to his own employees. No case cited by the majority and none known to me has ever imposed such liability on the contracting purchaser—either in Georgia law or elsewhere.

The result reached by imposing this duty of care is anomalous. Prior to the English decision in *Winterbottom v. Wright,* 1842, 10 M. & W. 109, 152 Eng.Rep. 402, and the celebrated American doctrine-blazer, *MacPherson v. Buick Motor Co.,* 1916, 217 N.Y. 382, 111 N.E. 1050, a manufacturer owed no duty at common law to the purchaser of his products. *MacPherson* imposed on the manufacturer a delictual duty to use due care in the manufacturing process to avoid injury to the purchaser of the commodity he manufactured. This duty was gradually extended until it became a doctrine of strict liability against manufacturers and sellers. *See* Restatement (Second) of Torts § 402 A. The history of this metamorphosis is recounted in scores of texts and commentaries, see, for example, Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099 (1960); Noel, Manufacturers of Products—The Drift Toward Strict Liability, 24 Tenn.L.Rev. 963 (1957); James, Products Liability, 34 Tex.L. Rev. 44, 192–228 (1955).

If those who buy from manufacturers in turn owe a duty to the manufacturer's employees, we have entered on a reverse evolutionary process in which buyers owe duties to sellers-manufacturers. The logic by which this result is attained would appear equally to impose a duty to communicate a warning if the buyer knew or should have known that a wall of the manufacturer's plant was unsafe; the majority does not limit the communicative duty to information about inherently dangerous qualities in the manufactured product. Good samaritans would doubtless give such warnings and I have no doubt that every moral person should. That is, however, not equivalent to legal duty.

Duty of care is imposed by law. Whether or not a duty exists is a question of law, not an issue for the fact-finder. *Georgia Railroad & Electric Co. v. Cole,* 1907, 1 Ga.App. 33, 57 S.E. 1026; L. Green, Judge and Jury 55 (1930); W. Prosser, The Law of Torts 206 (4th ed. 1971); Restatement (Second) of Torts § 328 B. We may examine it free from any presumption of fact-finder correctness. When I do this, I do not find in Georgia law any precedent for imposing a duty of care on the purchasing contractor.

II.

When we turn to the question of causation, we must consider one fact not con-

**436**

tained in the majority's resume: Thiokol not only was the manufacturer of the illuminant but it knew of the very qualities that made necessary the kind of special handling that would have averted the catastrophe. The trial court found that Thiokol had conducted illuminant explosion tests at its own facilities and was aware that "the ignition of untamped illuminant produces extremely rapid deflagration with explosive effects and a shock wave of devastating proportions."

It is patent that, if Thiokol already knew in substance what information about misclassification would have revealed about the necessity of additional safety precautions, *the failure to communicate the information to it* was not a cause of the fire and deflagration. Therefore, I do not see how it can be concluded that failure to communicate the illuminant's true qualities could have been a cause in fact ("but for" cause) of the injury. Even if it was a cause in fact, then I do not agree that there was sufficient evidence that it was a proximate (or legal) cause of the accident. Although proximate causation in Georgia, unlike duty of care, is an issue for the fact-finder, *Gross v. Southern Railway Co.*, 5 Cir. 1969, 414 F.2d 292, I would hold that the findings here are clearly erroneous.

The majority must perceive this problem, for, after observing that "Thiokol's negligence and the causal relationship of this negligence to the accident are, for present purposes at least, also undisputed," they find the requisite causal link to the government's negligence in the trial court's conclusion "that notice of a change in classification would have prompted measures by Thiokol which would have reduced the risk of an explosion . . . ." The trial judge properly did not conclude that Thiokol would have done this because of the danger to its employees or because communication would have told it something its executives did not know, but he apparently decided that Thiokol would have acted because *the contract* required it to act and, according to the testimony of the one witness on whose evidence the delicate fabric of causation is knit, it would have had no choice.

This bases causation—both cause in fact and legal cause—(and hence liability) on the contractual provisions, and thus unravels the key strand of the rope that supports the finding that the government owed a duty of care to Thiokol's employees: a common law tort duty, not one created by the contract with the government. If the contract did not and could not *create* a duty of care to the employees and did not and could not absolve the government of a duty of care, it is difficult for me to perceive how the self-same contract could create the indispensable next step to liability—causation.

It is possible to read the trial judge's findings in a different way. Even if Thiokol knew all that the government knew about the qualities of the illuminant and the hazards involved in its production, it did not know that the government also knew this. The fault of the government, then, was its failure to communicate the *fact* of reclassification of the illuminant because this would have revealed to Thiokol that the government was now aware of hazards greater than those mentioned in the contract. At that time, if Thiokol had known that the government had at last learned what Thiokol already knew, then it would have known that the government would be more vigilant in enforcing the contract. If this is a correct reading, then the causative link is even more evidently the contract itself. If, as I agree, the contract cannot be read to create a contractual duty to Thiokol's employees, I do not think it can create the causative relationship necessary to establish legal liability.

### III.

Let me restate as succinctly as possible the basis of this suit:

The government has consented to be sued for breach of contract and under the Federal Tort Claims Act. It is not contended that the government violated its contract; therefore, liability must arise out of the Tort Claims Act, and that is the only basis for relief alleged by the plaintiffs. As the majority correctly states, the Tort Claims

Act *creates* no torts. It permits liability only if the government commits a tort under applicable state law.

The majority and I agree that the government is not subject to strict liability on the basis that it contracted for the manufacture of so dangerous a commodity that it is liable without regard to fault. It might be desirable for the government to be subject to strict liability, but we all agree that such a consideration is for Congress. If the government is liable, it is liable only because it negligently failed to perform a duty of care imposed by Georgia law.

The principles we must apply to liability arising under Georgia law are simple tort concepts. They are not made esoteric because they are asserted in a claim against the United States or because the consequences for which damages are sought were tragic.

The capacity of the common law to grow, to change and to adapt is rightly vaunted. In deciding to impose a duty of care and thus to create new principles of tort liability, it is appropriate for courts to consider the plight of injured persons and of the survivors of the deceased as well as the means to distribute risks of injury among all of society instead of letting the consequences fall only on a luckless few. However, when sanctioning such extensions courts must also take into account that, when they create a new species of duty of care, they generate a new line of cases that will apply that duty and develop it further.

The duty of care that the majority here imposes, I respectfully submit, is not found in existing Georgia law. It is newly born. The concept of causation they adopt is likewise singular. Restricted as we are by the applicable statutes, the economic desirability of risk distribution and compassion for the injured do not appear to me sufficient to justify the creation of a new concept of liability, and these considerations provide even less reason for us as federal judges to construct what I think are new principles of state law.

I would hold that, under Georgia law, the purchaser of products from a manufacturer has no duty either to the manufacturer or his employees to warn of hazards known to the manufacturer; and that failure to tell a person what he already knows cannot constitute the cause of an injury the liability for whose occurrence is based solely on failure to communicate the information of danger. To impose liability on purchasers to the employees of their manufacturer-suppliers appears to me to make the stream of tort liability run uphill.