Douglas Glynn **PAYTON**, Administrator of the estate of Sheryl Lynn Payton, deceased, et al., Plaintiffs-Appellants,

v.

The **UNITED STATES** of America, Defendant-Appellee.

No. 79–2052.

United States Court of Appeals, Fifth Circuit.* Unit B

July 1, 1982.

---

* Former Fifth Circuit case, section 9(1) of Public Law 96–452—October 14, 1980.

Edward L. Hardin, Jr., Leon Kelly, Jr., Birmingham, Ala., for plaintiffs-appellants.

Wayne Schmidt, South San Francisco, Cal., Griffin B. Bell, Atlanta, Ga., for amicus curiae, Crime Victims Legal Advocacy Institute, Inc.

Emilia M. DeMeo, Trial Atty., Elois E. Davies, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendant-appellee.

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., HENDERSON, HATCHETT, ANDERSON and THOMAS A. CLARK, Circuit Judges.

HATCHETT, Circuit Judge:

Appellants bring this wrongful death action under the Federal Tort Claims Act (FTCA)[1] charging the United States with negligence resulting from the parole of a dangerously psychotic prisoner, who subsequently murdered appellants' decedent. The district court dismissed appellants' complaint due to lack of jurisdiction, based on the court's interpretation of the "discretionary acts" exemption to the FTCA, 28 U.S.C. § 2680(a).[2] A panel of this court reversed the district court's decision. *Payton v. United States*, 636 F.2d 132 (5th Cir. 1981). Finding that the district court, 468 F.Supp. 651, construed the exclusion too broadly, we affirm in part, reverse in part, and remand for further proceedings.

## FACTS

In 1975 and 1976, Thomas Warren Whisenhant, a parolee from federal custody, murdered three women, including appellants' decedent, Sheryl Lynn Payton. The

---

1. Title 28 U.S.C. § 1346(b) reads:

(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claim-

ant in accordance with the law of the place where the act or omission occurred.

2. Title 28 U.S.C. § 2680(a) reads:

The provisions of this chapter and section 1346(b) of this title shall not apply to—
(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

murders, which included rape and hideous mutilation of the women's bodies, bore all the earmarks of a severely disturbed mind. These acts were not the first manifestations of Whisenhant's sickness. In 1966, he was sentenced to twenty years in federal prison on a charge of assault with intent to murder arising out of the severe and brutal beating of a woman. His sentence was subsequently reduced to ten years, and he was granted parole in November, 1973.

"A 'facial attack' on the complaint requires the court merely to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true." *Menchaca v. Chrysler Corp.*, 613 F.2d 507, 511 (5th Cir. 1980), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980). Appellants allege that records available to the parole board at the time of the decision to release Whisenhant indicated that in 1963 Whisenhant was charged with assaulting a fourteen-year-old girl with intent to ravish, and he possibly participated in the murder of an elderly woman. Appellants also allege that while incarcerated, Whisenhant further evinced his homicidal aggressive tendencies toward women by threatening the life of an employee of the federal penitentiary, the only female with whom he came in contact. Further, Whisenhant's prison records indicate that he was repeatedly diagnosed as psychotic and described as a paranoid schizophrenic. Psychiatrists characterized his mental condition as aggressive, chronic, severe, and manifested by brutality and assaultive behavior. In 1968, one prison psychiatrist concluded that Whisenhant was in dire need of long-term psychiatric treatment, but he never received this treatment.

Appellants allege that the United States is liable for the negligence of the United States Board of Parole in deciding to release a known homicidal psychotic, in neglecting to provide for continued treatment or supervision after his parole, and in failing to consider all available records pertaining to Whisenhant's psychotic condition prior to granting him parole. The complaint further alleges that the United States is liable for the negligence of the United States Bureau of Prisons in failing to supply the parole board with records concerning Whisenhant's condition, in failing to confine Whisenhant in a mental hospital until his sanity was restored or his full sentence was served, and in failing to provide proper psychiatric care and treatment for Whisenhant after undertaking to do so.

The government attacked the complaint on three grounds, asserting (1) that the court lacked subject-matter jurisdiction because of the exclusion from the FTCA's jurisdiction found in 28 U.S.C. § 2680(a); (2) that the complaint failed to allege an actionable duty owed by the government to the appellants; and (3) that the appellants failed to exhaust their administrative remedies pursuant to 28 U.S.C. § 2675(a). Because the district court determined that it did not have jurisdiction pursuant to the 28 U.S.C. § 2680(a) exemption to the FTCA, it did not address the government's second and third contentions. A panel of this court reversed the decision of the district court, *Payton v. United States*, 636 F.2d 132 (5th Cir. 1981). This court granted rehearing en banc.

## ISSUE

This court faces the same issue addressed by the panel:

> [W]hether the alleged conduct by personnel of the United States Board of Parole and the United States Bureau of Prisons comes within the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680 (1976) (FTCA) or is exempt as a 'discretionary function' pursuant to 28 U.S.C. § 2680(a) (1976).

636 F.2d at 134. Because the district court dismissed this action solely on the ground that it lacked jurisdiction, our decision today reaches no further than that narrow issue.

## FEDERAL TORT CLAIMS ACT

The FTCA authorizes suits against the United States for money damages for personal injury or death caused by the tortious

actions of government employees acting within the scope of their employment, under circumstances where a private person would be liable. 28 U.S.C. § 1346(b). Exempt from jurisdiction, however, are claims based upon exercise by a governmental agency or employee of a "discretionary function or duty," whether or not an abuse of discretion results. 28 U.S.C. § 2680(a). The drafters of the Act, however, failed to define the term "discretionary function." This omission is understandable in light of the fact that the courts have struggled for nearly three decades to provide such a definition, with limited success. We will not pretend to succeed where our predecessors for thirty years have failed in providing succinct definition of the term "discretionary function." We will, however, review the guidelines presented by prior decisions and apply them to the facts before us.

## DISCRETIONARY FUNCTION

The seminal case construing the "discretionary function" exemption to the FTCA was *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The Supreme Court, perhaps reacting cautiously to the unprecedented waiver of governmental immunity, and perhaps wary because of the huge award in this case, provided this guideline for lower courts:

It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also included determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of section 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

346 U.S. at 35–36, 73 S.Ct. at 967–968.

The Court attempted to distinguish decisions made at the planning level (discretionary) from those at the operational level (non-discretionary). The Court determined that each negligent act transforming a quantity of fertilizer into a bomb which leveled an entire city was made at the planning level and therefore exempted from the FTCA.[3] If strictly followed, this language would exempt from the FTCA all but the most fortuitous events, for "[u]nless government officials (at no matter what echelon) make their choices by flipping coins, their acts involve discretion in making decisions." *Smith v. United States*, 375 F.2d 243, 246 (5th Cir.), *cert. denied*, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967). The Court, however, narrowed the *Dalehite* guidelines in later opinions.

In *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Court held that the decision to operate a lighthouse was discretionary, but once the decision was made there was no discretion to operate the light negligently. Similarly, in *Rayonier Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1956), the Court found an actionable claim against the government for the negligence of forest service employees in fighting a forest fire. Thus, the Court has told us that the decision not to inspect a lighthouse (*Indian Towing Co.*) and the decision not to send a crew to extinguish a smouldering forest fire (*Rayonier*) were both made on the "operational level" and therefore were

---

**3.** The Court found that the following decisions were made at the "planning level" and, therefore, were not actionable: (1) selecting a coating for the fertilizer which rendered it highly susceptible to explosion; (2) packing the fertilizer in paper bags, which were easily ignited and subject to tearing; (3) placing the fertilizer in the bags at a very high temperature; (4) packing the fertilizer in a manner that prevented it from cooling; and (5) failing to label the bags as a dangerous explosive and fire hazard.

not "discretionary acts" exempted under section 2680(a).

It is established in the Fifth Circuit that:

[T]he fact that the negligence may have occurred in connection with a discretionary function does not make the negligent act a discretionary function. Nor does the discretionary character of the government's initial ... undertakings govern whether a duty can arise out of those undertakings. The Tort Claims Act deals with sovereign immunity—that is, with whether the United States may be sued for certain torts; it does not define ... torts.

*Aretz v. United States*, 604 F.2d 417, 431 n. 18 (1979). Discretionary decision-making, then, is accompanied by nondiscretionary acts of execution, whether termed operational, ministerial, or clerical. With these guidelines in mind, we now consider whether the district court had jurisdiction to address the appellant's complaint.

## PART I.

■ The first count of the complaint alleges that the United States is liable for Sheryl Lynn Payton's death because the parole board, knowing Whisenhant to be a dangerous psychotic, nevertheless negligently released him on parole. Although the term "negligent release" is imprecise, we read the count as alleging that the parole board, having considered all information available to it, was negligent in deciding to release Whisenhant on parole. The question thus becomes whether the decision by the parole board was a discretionary act. We need go no further than the statute in order to make this determination. Former 18 U.S.C. § 4203(a) provides:

If it appears to the Board of Parole from a report by the proper institutional officers or upon application by a prisoner eligible for release on parole, that there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, and if in the opinion of the Board such release is not incompatible with the welfare of society, the board

may in its discretion authorize the release of such prisoner on parole.

Applicants would have us to read the statute to mean that the parole board must first determine that the prisoner is a "good risk," and if so then the parole board may, in its discretion, order his release on parole. Thus, the argument goes, the parole board's discretionary (non-actionable) function begins only after it has determined that the prisoner is worthy to return to society. Since the evaluation of the prisoner is a non-discretionary function, the government would not be immune from prosecution under 28 U.S.C. § 2680(a) for negligently performing that duty. That is not, however, what the statute says.

We read the statute to state that if the initial request for parole, whether submitted by the prison bureaucracy or by the prisoner himself, shows a reasonable probability that the prisoner is capable of living in society without violating the laws or endangering the public welfare, then the parole board may, in its discretion, release the prisoner on parole. The decision to release the prisoner on parole must necessarily entail an evaluation by the parole board of the prisoner's records. Thus, the parole board's final decision that the prisoner is worthy to live in society as a free person is not different from the decision to release him on parole. The statute clearly describes this as a discretionary function.

Appellants attempt to draw a parallel between the instant case and *Fair v. United States*, 234 F.2d 288 (5th Cir. 1956), and *Underwood v. United States*, 356 F.2d 92 (5th Cir. 1966). In *Fair*, a mentally disturbed air force officer who had threatened to kill a woman was released from a military hospital despite the fact that air force physicians knew of the threats. The officer subsequently killed the woman and two hired bodyguards. The government argued that the diagnosis, care, and treatment of the officer were within the discretionary function exception to the FTCA, and therefore not actionable.[4] This court agreed

4. The base provost marshal had promised to notify the woman prior to the officer's release,

that the decision to treat the officer was discretionary, but once the decision was made to treat him, the government was under a non-discretionary duty to perform the treatment with due care.[5]

Thus, the court did not base its decision on the "negligent release" of the officer, but rather on his "negligent medical treatment," which encompassed the decision to release him from the hospital. That decision was no different, under the facts in *Fair*, from the decision to administer or withhold medication. The doctor was under a non-discretionary duty to render adequate care to his patient, and if the decision to release him could not be justified under prevailing medical standards, the doctor was guilty of an act of negligence. The FTCA subjected the government, as the doctor's employer, to the same liability that a private employer would face. This situation is in no way analogous to the parole board, acting within the discretion granted it by statute, deciding to release a prisoner on parole.

*Underwood* involved a mentally disturbed airman who was released from hospitalization to return to active duty, and who subsequently killed his wife with a military weapon. Here, the initial physician, prior to being transferred, negligently failed to provide his replacement with vital information concerning the airman's mental state. The replacement physician, lacking this information, released the airman to duty with disastrous results. This court found actionable negligence not in the decision to release the airman from the hospital, but rather in the failure of the initial physician to transfer vital information to his replace-

ment, an "operational" function. Again, this case is inapposite to our current discussion.

In holding that the actual decision to grant or deny parole is within the complete discretion of the parole board, we do not hold that the board has the discretionary power to ignore the required steps of the decision-making process.

## PART II.

Count II of the complaint alleges that the parole board negligently failed to make adequate provisions for the continued treatment or supervision of Whisenhant. Again, we need only to look to the controlling statute to determine whether we are faced with a discretionary function. Former 18 U.S.C. § 4203(a) states that the "parolee shall be allowed in the discretion of the board, to return to his home, or to go elsewhere, upon such terms and conditions ... as the board shall prescribe ...." The terms of the parole are within the discretion of the parole board. While the board could have provided for continued supervision of Whisenhant during his parole, and although failure to do so might appear to be an abuse of discretion, that decision was discretionary and therefore is excluded from the FTCA by 28 U.S.C. § 2680.

## PART III.

Count III of the complaint alleges that although the Parole Board had access to records showing that Whisenhant was a psychotic with homicidal tendencies and would endanger society if released, the Board negligently failed to acquire, read, or

but he failed to do so. The government argued that he was under no legal duty to do so, stating that no air force regulation imposed upon him the duty to aid civilians. Finding that it was testing the government's liability under the FTCA rather than determining military duties, the court held that the government would be liable for the actions of the provost marshal under the same theory that would support an action against a private employer under the state law being applied. 234 F.2d at 296.

**5.** In reaching this conclusion, the court cited *Eastern Airlines, Inc. v. Union Trust Co.,* 221

F.2d 62 (D.C.Cir.1955), aff'd. sub. nom., *United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). In Eastern, the court found that, while controlling air traffic was discretionary on the government's part, the air traffic controller in the tower functioned at the "operational level." While he may exercise discretion in determining, for example, which approach pattern an aircraft should take, he was not performing the sort of discretionary functions contemplated by section 2680(a).

give adequate consideration to these records. We find Count III of the complaint insufficient. Count III implicates the discretionary function of the Board. To withstand a motion to dismiss, an allegation challenging the Board's performance of any ministerial act must be sufficiently distinguishable from a complaint disputing the Board's exercise of its discretionary function. The plaintiff must therefore allege that the Board breached a duty sufficiently separable from the decision-making function to be nondiscretionary and outside of the exception. The plaintiff may not withstand a motion to dismiss by alleging that the Board's decision was wrong.

We therefore find insufficient the allegation that the Parole Board failed to acquire, read, or give adequate consideration to these records. The acquisition and examination of the records on which the Board bases its ultimate decision necessarily implicates its discretionary function. In fulfilling this task, the Board must exercise its judgment by determining the materiality of certain studies and documents and the propriety of relying thereon in reaching its final assessment.[6] Further, the manner and degree of consideration with which the Board examines these materials is inextricably tied to its ultimate decision. This allegation thus addresses the Board's exercise of its discretionary function. For these reasons we hold that the trial court properly dismissed Count III.

### PART IV.

■ Count IV of the complaint alleges that agents of the United States, presumably the Bureau of Prisons, failed to supply the parole board with records that would show Whisenhant to be a dangerous psychotic and a menace to society. The con-

trolling statute is former 18 U.S.C. § 4208(c), which states:

> It shall be the duty of the various probation officers and government bureaus and agencies to furnish the board of parole information concerning the prisoner, and, whenever not incompatible with the public interest, their views and recommendations with respect to the parole disposition of his case.

This statute placed a duty on the Bureau of Prisons to provide the parole board with Whisenhant's records. No discretion is involved. The district court therefore had jurisdiction to entertain this count of the complaint.

### PART V.

■ Count V of the complaint alleges that the United States had a positive duty pursuant to 18 U.S.C. § 4241 to ascertain the nature and extent of Whisenhant's mental problem and to place him in a mental institution for the remainder of his full sentence. The controlling statute, 18 U.S.C. § 4241, states that a board of examiners for each federal prison "shall examine any inmate of the institution alleged to be insane or of unsound mind or otherwise defective and report their findings and the facts on which they are based to the attorney general." This section of the statute places an affirmative, non-discretionary mandate upon the government to examine inmates who may be insane. The statute continues:

> The attorney general, upon receiving such report, may direct the warden . . . to cause such prisoner to be removed to . . . any . . . institution authorized by law to receive insane persons . . . convicted of offenses against the United States, there to be kept until . . . the prisoner shall be

---

**6.** We find nothing inconsistent in holding on the one hand that the Board's ultimate decision is discretionary and within the ambit of the exclusion, and on the other hand suggesting, by the formulation of the test we announce, that there may be Parole Board acts which are sufficiently separable from the decision-making function to be deemed non-discretionary. For example, non-discretionary action would perhaps be involved if a clerk in the Parole Board office negligently failed to forward requested material records to the Parole Board members, or if the chairman of the Parole Board bypassed the decision-making function and simply executed a form releasing a parolee. We express no opinion with respect to the foregoing examples which are not presented by the facts of the case; they merely provide some flesh on the bare-boned standard we announce.

restored to sanity or health or until the maximum sentence without deduction for good time or commutation of sentence shall have been served.

This portion of the statute allows the attorney general in his discretion, to order certain prisoners to be hospitalized. Here, we have an operational function preceding a discretionary decision. This count, therefore, may stand to the extent that it charges the government with negligence in failing to examine Whisenhant and report their findings to the attorney general or his designee as required by statute.

## PART VI.

 Count VI of the complaint alleges that the Bureau of Prisons undertook to render psychiatric treatment to Whisenhant, but did so negligently. This is analogous to *Fair*, wherein this court held that if the government undertakes to render psychiatric care, it will be liable for doing so negligently. It is established in the Fifth Circuit that when the government undertakes to perform services which would not be required in the absence of specific legislation, it will be liable if these activities are performed negligently. *Ross v. United States*, 640 F.2d 511, 519 (5th Cir. 1981). Without commenting on the merit of the allegation, we hold that the district court has jurisdiction to entertain the allegations contained in this count.

## CONCLUSION

The district court properly determined that the decision to release a prisoner on parole is a discretionary function within the meaning of 28 U.S.C. § 2680(a). The court erred, however, in finding that requesting or transmitting records and providing standard medical care "appertained to the parole decision" and were therefore not actionable.

Finding that the decision of the parole board to release a prisoner on parole and the determination of the terms of parole are discretionary functions, we affirm the district court's dismissal of Counts I and II. Because we find that the appellant failed to sufficiently allege a non-discretionary act against the parole board in this case, we affirm the trial court's dismissal of Count III of the complaint. We reverse the decision of the district court as to Count IV of the complaint and remand for further proceedings because the appellants alleged a non-discretionary act. Because we find that the decision of the prison medical board to examine allegedly insane prisoners is non-discretionary, we reverse the decision of the district court as to that part of Count V and remand. Because we find that the decision of the attorney general or his designee to place an insane prisoner in a mental institution is a discretionary act, we affirm the decision of the trial court as to that part of Count V. Because we find that once the government assumed the duty of providing psychiatric treatment to Whisenhant, it was under a non-discretionary duty to provide proper care, we reverse the decision of the district court as to Count VI of the complaint and remand.

REVERSED AND REMANDED.

RONEY, Circuit Judge, concurring in part and dissenting in part:

I fully concur in Judge Tjoflat's dissent except to the extent that it makes a value judgment as to whether Congress should or should not provide a cause of action under the circumstances of this case. I am convinced that Congress did not intend to create such a cause of action, for the reasons stated by Judge Tjoflat. Whether it should or should not is up to Congress.

TJOFLAT, Circuit Judge, joined by RONEY, HILL and FRANK M. JOHNSON, Jr., Circuit Judges, concurring in part and dissenting in part:

I concur in the rejection of the appellants' principal claims, which the majority correctly holds are based on the exercise of discretionary functions. However, I am unable to join the majority in interpreting the Federal Tort Claims Act to authorize the parsing of a discretionary function into its operational components. In my view, by holding that an act antecedent to a discretion-

ary function is actionable, the majority not only misconceives Congress' intent, but also invites litigation that may debilitate our system of criminal justice administration. Therefore, I dissent from those portions of its decision which hold that the district court has jurisdiction to consider Counts IV and V of the complaint.[1]

## I.

The United States Board of Parole (the Parole Board or the Board) granted parole to Thomas Warren Whisenhant on November 28, 1973. Whisenhant murdered appellants' decedent on October 16, 1976. The gist of the complaint is that Whisenhant's parole was premature and proximately caused the death of decedent.[2] Artfully drawn, the complaint articulates two principal theories of liability: (1) that the Board's decision to release Whisenhant was negligent; (2) that agents of the United States negligently performed duties antecedent to the Board's decision so as to cause the Board to release Whisenhant earlier, or on different conditions, than it otherwise would have.[3]

The majority holds, as it must, that the decision to grant or deny parole was within the complete discretion of the Parole Board,[4] so that a claim alleging a negligent parole decision is barred by the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1976) (FTCA).[5] In its discussion of Counts III,

1. While I agree that the district court lacks jurisdiction to consider Counts I, II and III of the complaint, alleging the negligent release and parole of Whisenhant, the negligent failure to make adequate provision for his continued treatment or supervision and the Parole Board's failure to acquire, read, or adequately consider records pertaining to Whisenhant, I reject the dictum in footnote 6 of the majority opinion that the district court would have jurisdiction of a claim based on the Parole Board's failure to perform a ministerial act antecedent to the exercise of its discretionary role. Since I understand Count VI to allege that the negligent psychiatric treatment of Whisenhant proximately caused the plaintiffs' injuries *without* the mediation of the parole decision, I have no quarrel with the majority's treatment of that count.

2. The complaint also alleges a *negligent failure* to make adequate provision for the continued treatment or supervision of Whisenhant (Count II) and the negligent psychiatric treatment of Whisenhant (Count VI). See note 1, *supra*.

3. Count III alleges that the Board failed to acquire, read, or adequately consider records pertaining to Whisenhant. Count IV alleges that the Bureau of Prisons failed to supply the Board with pertinent records. Count V alleges that the government failed to examine Whisenhant's mental condition. All three counts contemplate that if the Board had had and considered the relevant material, it would have acted differently on Whisenhant's parole application. Because Counts III, IV, and V embody the same theory, I treat them together.

4. In 1973, the Parole Board was an organ of the Department of Justice consisting of eight members appointed by the President with the advice and consent of the Senate. 18 U.S.C. § 4201 (1970). In 1976, the Board became an independent agency with nine members, designated the United States Parole Commission (Parole Commission or Commission). Parole Commission and Reorganization Act, Pub.L.No.94-233, § 2, 90 Stat. 219 (1976), *codified at* 18 U.S.C. § 4202 (1976). I speak sometimes of the Board and sometimes of the Commission, depending on whether my focus is on the events precipitating this lawsuit or on the current parole system.

By statute, the Parole Commission operates differently than did the Parole Board in certain respects, some of which I shall note as appropriate. *Compare* 18 U.S.C. § 4201 *et seq.* (1976) *with* 18 U.S.C. § 4201 *et seq.* (1970). However, the 1976 Parole Commission and Reorganization Act did not dilute the discretionary nature of the parole decision. The majority's analysis, and the analysis of this dissent, pertain alike to the 1973 parole decision which is the subject of this lawsuit and to parole decisions being rendered in 1982 by the Parole Commission.

5. We have long recognized that the statutes governing parole in 1973, former 18 U.S.C. § 4201 (1970) *et seq.*, "bristle[d] with discretion given the Board." *Hiatt v. Compagna*, 178 F.2d 42, 45 (5th Cir. 1949). In *Scarpa v. U. S. Board of Parole*, 477 F.2d 278 (5th Cir.) (en banc), *vacated as moot*, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44 (1973), holding that a complaint alleging a denial of a fair hearing by the Parole Board did not state a cause of action upon which relief could be granted, we stated:

The Board is an independent statutory agency which is granted broad discretionary powers in parole eligibility determinations. We have previously held that:

By the language of Title 18 U.S.C.A. § 4203, the Board of Parole is given absolute discretion in matters pertaining to parole. The courts are without power to grant a parole or to determine judicially eligibility for parole.... Furthermore, it is

IV, and V of the complaint, the majority opinion then addresses, in isolation and in the abstract, allegations of negligent acts by the Parole Board and the Bureau of Prisons. As to each such act, it inquires simply whether the act, viewed as a discrete phenomenon, is *inherently* discretionary. In my view, the majority fundamentally errs by failing to treat the alleged acts of negligence in the context of the facts of this case. The question is whether Congress intended these acts to be actionable within the FTCA or to be exempt as discretionary functions. All agree that the parole decision itself is discretionary. The alleged misfeasance of the Parole Board and the Bureau of Prisons has legal significance in this case only insofar as it relates causally to the ultimate parole decision. The issue follows ineluctably: did Congress, when it enacted the FTCA, intend to permit persons injured by parolees to state claims based on the negligent performance of acts antecedent to the discretionary parole decision?

## II.

The legislative history of the FTCA does not disclose the intended scope of the discretionary function exception. The exception, as now worded, first appeared in a 1942 tort claims bill.[6] The hearings on that bill are pertinent to the intent of the exception, because no legislative hearings relevant to the exception were held in 1946, when the FTCA was enacted. During the 1942 hearings, Assistant Attorney General Shea stated that the exception was designed to preclude a judicial test of the legality of regulations or the propriety of discretionary administrative acts.[7] The Senate and House Committee Reports on both the 1942 and the 1946 versions of the FTCA indicate that there is no cause of action for discretionary acts even though

not the function of the courts to review the discretion of the Board in the denial of the application for parole or to review the credibility of reports and information received by the Board in making its determination.

*Id.* at 280–281, *quoting Tarlton v. Clark*, 441 F.2d 384, 385 (5th Cir.), *cert. denied*, 403 U.S. 934, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971) (citations omitted). We said further in *Scarpa*, "The weight to be given [the offender's] criminal history is solely within the province of the Board's broad discretion in determining parole eligibility. It is not the function of the court to second-guess the outcome of such proceedings or what factors went into their formulation." 477 F.2d at 281.

In an earlier decision holding that the Parole Board's denial of parole did not violate a prisoner's due process rights, we adopted the opinion of the district judge, who concluded, relying on *Tarlton*, that the terms of the parole statute are clearly discretionary, and that the prisoner's argument that the statute should be construed in mandatory terms was contrary to the case law. *Buchanan v. Clark*, 446 F.2d 1379 (5th Cir. 1971).

Nor did the 1976 recodification of the parole statute by the Parole Commission and Reorganization Act, see note 4, *supra*, alter the discretionary nature of the parole decision. In their joint statement on the bill that was to establish the United States Parole Commission, the House and Senate Managers stated:

Because of the scope of authority conferred upon the Parole Board, its responsibilities are great.... The final determination of pre-

cisely how much time an offender must serve is made by the parole authority. The parole agency must weigh several complex factors in making its decision, not all of which are necessarily complementary.

H.Conf.Rep.No.94–838, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Ad.News 335, 351–52. The conferees further declared their intent to "commit[ ] to the discretion of the Commission" the judgments underlying individual parole decisions. *Id.* at 358. Presumably for that reason, the Parole Commission and Reorganization Act provides that actions of the Parole Commission are committed to agency discretion for purposes of the Administrative Procedure Act, and thus are exempt from APA review. 18 U.S.C. § 4218(d) (1976). Finally, the conferees announced their "complete agreement with the Fifth Circuit holding in [*Scarpa*] that the weight assigned to individual factors (in parole decision making) is solely within the province of the (commission's) broad discretion." *Id.* at 360.

In *Shahid v. Crawford*, 599 F.2d 666 (5th Cir. 1979), we reaffirmed our recognition that "[t]he Commission's discretion is indeed broad." *Id.* at 669.

6. *Dalehite v. United States*, 346 U.S. 15, 26 n. 12, 73 S.Ct. 956, 963 n. 12, 97 L.Ed. 1427 (1953), *citing* H.R. 6463, 77th Cong., 2d Sess.; S. 2207, 77th Cong., 2d Sess. (1942).

7. *See* Tort Claims: Hearings on H.R.5373 & H.R.6463 Before the House Comm. on the Judiciary, 77th Cong., 2d Sess. 33 (1942).

negligently performed and involving an abuse of discretion.[8] The legislative reports characterized section 2680(a) as a "highly important exception" designed to preclude damage suits against the government for such authorized activities as a flood control project, but to allow suits for common law torts such as the negligent operation of a motor vehicle.[9]

Judicial interpretations of the discretionary function exception are equally uninstructive. The case law does provide standards for gauging whether a particular act is within the exception by virtue of its inherently discretionary nature.[10] But I know of no case which addresses whether Congress intended to permit plaintiffs to route their claims *through* a palpably discretionary act *to* an antecedent act, and thereby to maintain an action which the exception would otherwise bar.

In the absence of guidance from the legislative history or the case law, this court's task is to construe the statute in light of the purposes Congress sought to serve. *See Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979); *Gates v. Collier,* 616 F.2d 1268, 1275 n.11 (5th Cir. 1980). In light of the purposes of the discretionary function exception, it is highly unlikely that Congress intended to countenance such lawsuits as this one.

8. *See* H.R.Rep.No.2245, 77th Cong., 2d Sess. 10 (1942) (report on 1942 version of Tort Claims Act); S.Rep.No.1196, 77th Cong., 2d Sess. 7 (1942) (same); H.R.Rep.No.1287, 79th Cong., 1st Sess. 5–6 (1945) (report accompanying FTCA as enacted in 1946).

9. See note 8, *supra.*

10. *See generally,* Case Comment, *Scope of the Discretionary Function Exception Under the Federal Tort Claims Act,* 67 Geo.L.J. 879 (1979); Harris & Schnepper, *Federal Tort Claims Act: Discretionary Function Exception Revisited,* 31 U.Miami L.Rev. 161 (1976).

11. *See,* Reynolds, *The Discretionary Function Exception of the Federal Tort Claims Act,* 57 Geo.L.J. 81, 121–23 (1968).

12. *Id.* at 121. Since the United States is the defendant in all FTCA cases, the personal liability of the official is not a consideration.

Three predominant justifications for the discretionary function exception have been identified.[11] First, it promotes the separation of powers by sparing federal officials from explaining their official actions in court. Absent the exception, federal decision-makers would be subject to the vexation and time expenditure of lawsuits and to the consequent loss of independence in their decision-making.[12] If the discretionary function exception can be pierced by a claim based on the acts of individuals who feed information to the ultimate decision-maker, or who perform other acts antecedent to the exercise of discretion, the officials whom Congress sought to shield will be exposed to precisely the hazards the exception seeks to dispel.[13] The instant case is illustrative. To prevail, the plaintiffs must prove that the alleged antecedent acts caused Whisenhant's premature parole. To accomplish this, the plaintiffs must explore at trial the decision-making process of the Parole Board that released Whisenhant. They must analyze the probable effect of certain information on the parole decision. Certainly this means that the Parole Board members will be called to testify to the reasons for the Board's decision, the factors it considered and the weight it gave to them, the weight it gave to various materials in past decisions, and the probable effect of particular information on the parole decision in this case—in short, the same testimony that would be called for if the Board's decision itself were the basis of the suit.[14]

13. I emphasize that this and the following paragraphs do not expound policy reasons for the interpretation of the FTCA which I endorse. Rather, they argue that the recognized purposes of the discretionary function exception can be served only by adopting that interpretation.

14. It is conceivable, though seemingly not likely, that the plaintiffs could make their case without calling the Parole Board members to testify. Then, however, they would have to ask the court, as trier of fact in the non-jury FTCA trial, 28 U.S.C. § 2402 (1976), to determine, without the benefit of the Board members' testimony, what the Board would have done—i.e., what it *should* have done—with certain information. This procedure would require the court to perform the Parole Board's function, a process as contrary to the purpose of the discretionary function exception as calling the board members to testify. See p. 487, *infra.*

Furthermore, the majority decision threatens the independent operation of the Parole Commission [15] by providing a strong incentive to incarcerate all convicts for as long as the law permits. The lawsuit which the majority sanctions thus has the same vexation and time-consumption potential as an action premised on the parole decision itself, and is equally likely to inhibit the exercise of independent judgment by the Commission.

The second justification for the discretionary function exception is that in areas of policy-making, courts are not equipped to investigate and weigh the factors which enter into the decisions of the other branches. The normal rules of liability are not readily applied to typically governmental tasks; liability normally rests on fault, and courts cannot satisfactorily judge whether an error in policymaking has been negligently made. They can make such judgments, if at all, only by considering in hindsight the various factors known to government officials.[16] This principle, so manifestly applicable to a complaint directly alleging an erroneous parole decision,[17] applies equally to the present action. As I have noted, such an action requires a critical examination of the Parole Board's proceedings so that the effect of the alleged

antecedent act can be gauged. The courts are no better suited to conduct such an inquiry in a case nominally based on a negligent antecedent act than in a case alleging a negligent release.

The third purpose of the discretionary function exception is to prevent the enormous and unpredictable financial cost which could result from judicial re-examination of governmental decisions.[18] Since all parole decisions overlay ministerial acts which can be performed negligently so as to affect the ultimate exercise of discretion, the majority's position subverts this third purpose by sanctioning indirect challenges to every parole release whose beneficiary commits a crime that has a victim.

In summary, to recognize jurisdiction of a claim based on an act antecedent to a discretionary act is to frustrate every purpose which the exception advances. Congress cannot have intended the FTCA to be so interpreted as to negate the very purpose of the exception. Thus, my quarrel with the majority is that its mechanistic reading of the statute and its vision of governance as a sequence of discrete acts, some inherently discretionary and others inherently and in all contexts ministerial, leads to a misinterpretation of congressional intent.

---

**15.** See note 4, *supra.*

**16.** *See,* Reynolds, *supra* note 11, at 122.

**17.** The parole decision, although in large measure quasi-judicial, see note 19, *infra,* has a significant policy-making component. As a prerequisite to parole release, the Parole Commission determines whether "(1) . . . release would [ ] depreciate the seriousness of [the] offense or promote disrespect for the law; and (2) . . . [whether] release would [ ] jeopardize the public welfare." 18 U.S.C. § 4206(a) (1976). So determining, the Commission both implements and sets policy. Particularly in evaluating whether release would depreciate the seriousness of the offense or promote disrespect for the law, the Commission makes systemic and predictive judgments typical of the policy-maker. Similarly, the Commission's wide latitude to impose parole conditions and to provide such "limitations as are reasonable

to protect the public welfare," 18 U.S.C. § 4209 (1976), endows the Commission with a policy-making function. *See also,* former 18 U.S.C. § 4203 (1970).

More generally, the data considered by the Commission in making individual parole decisions is of two sorts: information about the particular offender and his crime and such other information (about society's perception of the crime, current doctrines of deterrence, punishment, and rehabilitation, current trends in criminal behavior, and so on) as is necessary to effect the objectives of the release policy announced in the parole statute. To the considerable extent that the Commission considers the second sort of input, it functions as an organ of policy.

**18.** *See,* Reynolds, *supra* note 11, at 122.

## III.

### A.

For the federal government generally, and for the administration of criminal justice in particular, the legal and practical implications of today's decision are substantial. For the federal government, the decision effectively nullifies the discretionary function exception of the FTCA. Underlying every exercise of discretion are myriad ministerial acts but for which the discretion might have been exercised differently: the typing of reports, the operation of a computer, the transmittal of information, the maintenance of files, and so on. Any of these tasks can be performed negligently so as to cause injury through the mediation of the discretionary function it supports. The majority permits every person so injured to maintain an action based on the negligent performance of the antecedent act. *After today's decision, there is no longer such a thing as a complaint artfully alleging a misuse of governmental discretion which cannot withstand a motion to dismiss based on the discretionary function exception.* Congress cannot have envisioned such a state of affairs.

The practical effects of the decision are, in general terms, evident: federal officials who exercise discretion will now be subject to being haled into court to explain and justify their decisions. The probable cost in time, money, and job performance is inestimable. More specifically, I am convinced that today's decision threatens serious damage to the administration of our system of criminal justice. To illustrate why, I describe relevant parts of that system:

### B.

Following a federal criminal conviction which may result in incarceration, the sentencing judge and the Parole Commission, in what is in effect a bifurcated sentencing proceeding, determine when the offender will be released from federal custody. While most laymen doubtless perceive sentencing as the chief determinant of the offender's fate and parole as an instrument of mitigation or clemency, the fact is that the sentencing judge and the Parole Commission perform comparable and complementary roles in determining the period of incarceration.[19]

In the first stage of the bifurcated proceeding, the judge announces a sentence within statutory limits.[20] The factors normally considered in determining sentence are the nature and circumstances of the offense and the offender and the four purposes of sentencing: punishment, deter-

---

**19.** "[A] surprising feature of the system ... [is] ... the relationship between the sentencing judge and the United States Parole Commission. Pursuant to various statutes, the judge has broad authority to determine the sentence of an offender. If the sentence is to imprisonment, the judge's sentence determines the offender's parole eligibility date and ... the maximum duration of incarceration. Within the limits so established, the Parole Commission determines the actual release date." The Federal Judicial Center, The Sentencing Options of Federal District Judges (rev. ed. 1981), at I–2.

"The decision as to when a lawfully sentenced defendant shall actually be released has been committed by Congress, with certain limitations, to the discretion of the Parole Commission.... Congress has decided that the Commission is in the best position to determine when release is appropriate, and in doing so, to moderate the disparities in the sentencing practices of individual judges. The authority of sentencing judges to select precise release

dates is, by contrast, narrowly limited...." *United States v. Addonizio*, 442 U.S. 178, 188–89, 99 S.Ct. 2235, 2242, 60 L.Ed.2d 805 (1979).

Courts have recognized the judicial nature of the parole determination. *See, e.g., Sellars v. Procunier*, 641 F.2d 1295, 1302 n.15 (9th Cir. 1981), *quoting Bricker v. Michigan Parole Bd.*, 405 F.Supp. 1340, 1345 (E.D.Mich.1975) ("In deciding to grant, deny, or revoke parole, [Parole Board members] act in a quasi-judicial capacity, as an arm of the sentencing judge...."); *Pate v. Alabama Bd. of Pardons and Paroles*, 409 F.Supp. 478, 479 (M.D.Ala. 1976), *aff'd*, 548 F.2d 354 (5th Cir. 1977) ("The function of the Parole Board is more nearly akin to that of a judge in imposing sentence and granting or denying probation than it is to that of an executive administrator.")

**20.** This discussion purports to describe only the archetypal sentencing and parole process for an adult offender. Most variations on the typical sequence are not noted.

rence, incapacitation and rehabilitation. If imprisonment is indicated, the judge may prescribe any term up to the maximum.[21] The sentence determines the date at which the prisoner will be eligible for parole release: a prisoner is normally eligible after one-third of the sentence term, or after ten years in the case of a life sentence or a sentence of more than thirty years. 18 U.S.C. § 4205(a) (1976).[22] However, the sentencing judge may designate an earlier eligibility date or specify that the prisoner is immediately eligible. 18 U.S.C. § 4205(b).

If the judge concludes that incarceration would poorly serve the punitive, deterrent, incapacitative or rehabilitative purpose of sentencing, he may place the offender on probation, so long as the offense is not punishable by death or life imprisonment. 18 U.S.C. § 3651 (1976).[23] Probation is "upon such terms and conditions as the court deems best." *Id.* It may be supervised or unsupervised. Statutorily authorized probation conditions include residence in a halfway house or participation in its programs; participation in a drug program; payment of a fine; support of persons for whose support the offender is legally responsible; and restitution or reparation to aggrieved parties. *Id.*

If the defendant is to be incarcerated, he will be committed to the custody of the Attorney General for assignment to an institution by the Bureau of Prisons. The assignment is determined by the nature of the offense, the character and mental condition of the defendant, and such other factors as are pertinent to discipline, care and treatment. 18 U.S.C. § 4081 (1976).

If a sentence of more than one year in prison is imposed, a panel of two hearing examiners normally conducts an initial parole hearing within 120 days of the offender's arrival at a Bureau of Prisons institution. 28 C.F.R. § 2.13(a) (1980). Following that hearing, a presumptive release date is established by a Regional Commissioner acting for the Parole Commission upon the panel's recommendation.[24] Interim hearings are held to consider developments occurring after the initial hearing. Following these hearings, presumptive release dates may be retarded on account of disciplinary infractions. 28 C.F.R. § 2.14 (1980).

To the extent permitted by the sentence, the Parole Commission uses its own criteria for determining the appropriate length of incarceration. Commission guidelines, setting forth the "customary time to be served," are based on the severity of the offense and an estimate of the likelihood that the offender would violate parole if released. The Parole Commission, like the sentencing judge, see p. 488, *supra,* implements a national sentencing policy. In establishing a presumptive release date, the Commission considers both offense- and offender-specific data and whether release

---

**21.** A few statutes, *e.g.,* 18 U.S.C. § 924(c) (1976), have minimum terms and a few, *e.g.,* 18 U.S.C. § 2114 (1976), have fixed terms.

**22.** A prisoner serving a term of six months through one year is normally not eligible for parole. 18 U.S.C. § 4205(f) (1976). A prisoner serving a term of less than six months is not eligible for parole.

**23.** If the defendant was convicted of multiple counts, the court may impose imprisonment on one or more counts, followed by probation on one or more others ("mixed sentence"). Upon a conviction of one or more counts, the court may impose a sentence of imprisonment of more than six months, and provide that the defendant be confined for a stated period of six months or less, and be placed on probation for the remainder of the sentence ("split sentence"). 18 U.S.C. § 3651 (1976). In no case may a term of probation exceed five years. *Id.*

**24.** 28 C.F.R. § 2.12 (1980). Under circumstances set out in 28 C.F.R. §§ 2.11(a)–(c), 2.12(a), and 2.14(c), the initial hearing may be delayed or a presumptive release date may not be set.

At the time of Whisenhant's release in 1973, presumptive release dates were not used; parole hearings resulted either in release within six months or continuance until the next hearing. Also, although hearing examiners conducted many parole hearings, Parole Board members themselves performed this function as well.

would depreciate the seriousness of the offense, promote disrespect for the law, or jeopardize the public welfare. See note 17, *supra*. The Commission has considerable discretion to choose a period of incarceration within the guideline range as well as to depart from the guidelines, with a statement of reasons, if the circumstances of the case so warrant. The Sentencing Options of Federal District Judges, *supra* n. 19 at IV–2.

### C.

Both the sentencing[25] and the parole decision are based in large part on data supplied by instrumentalities of government. The cornerstone of both decisions is the presentence investigation report (PSI) prepared by the court's probation officer.[26]

Fed.R.Crim.P. 32(c)(2) requires that the report contain the defendant's prior criminal record, information about his characteristics, his financial condition and the circumstances affecting his behavior, and such other information as the court may require. *The Presentence Investigation Report* (Publication 105),[27] further instructs the probation officer:

> The presentence report describes the defendant's character and personality, evaluates his or her problems and needs, helps the reader understand the world in which the defendant lives, reveals the nature of his or her relationships with people, and discloses those factors that underlie the defendant's specific offense and conduct in general. It suggests alternatives for sentencing and the supervision process.[28]

To ensure completeness and uniformity of format, the Probation Service uses what it calls the "core concept"; the PSI consists of a core of essential data supplemented by additional pertinent information. The report consists of the five core categories and their subcategories set out in the margin.[29]

A second publication, the *Probation Manual*,[30] prescribes an investigative procedure. The probation officer is urged to meet personally with the defendant at least twice,[31] and to verify independently as much factual data obtained thereby as possible.[32] The

---

**25.** My analysis assumes that the judge's sentencing decision is itself a discretionary function within 28 U.S.C. § 2680(a). Though no case has decided this point, it appears incontestable.

**26.** Fed.R.Crim.P. 32(c)(1) requires the presentence investigation report and specifies when it may be omitted. The stated purpose of the report is to aid the sentencing judge. Fed.R. Crim.P. 32(c)(2). However, among its other functions is to furnish the Parole Commission with information pertinent to parole consideration. Administrative Office of the United States Courts, Division of Probation, Publication 105, *The Presentence Investigation Report*, at 1 (1978).

**27.** See note 26, *supra*.

**28.** Publication 105 at 1.

**29.** 1. *Offense* (Core)
*Official Version*
Defendant's Version
Codefendant Information
Statement of witnesses, complainants, and victims
2. *Prior Record* (Core)
Juvenile adjudications
Adult arrests
Adult convictions

3. *Personal and Family Data* (Core)
*Defendant*
Parents and siblings
Marital
Education
Employment
Health
 Physical
 Mental and emotional
Military service
Financial condition
 Assets
 Liabilities
4. *Evaluation* (Core)
Alternative Plans
Sentencing Data
5. *Recommendation* (Core)
*Id.* at 5–6. Publication 105, at 7–17, contains a more detailed list of contents.

**30.** 10 Administrative Office of the United States Courts, *Guide to Judiciary Policies and Procedures, Probation Manual*, Ch. 2 (1978).

**31.** Publication 105, note 26 *supra*, at 3; *Probation Manual*, note 30 *supra*, §§ 2003, 2103.

**32.** Publication 105, note 26 *supra*, at 3, 5; *Probation Manual*, note 30 *supra*, § 2003.

probation officer will consult with the prosecutors, local law enforcement agencies anywhere the defendant is likely to have a police record, social service agencies, any agency that has supervised the defendant as a pretrial releasee, probationer, or parolee, all federal law enforcement agencies, credit bureaus and banks, and the Defense Department if the accused was in the military.[33] The probation officer is advised that if information received from the defendant conflicts with that obtained from other sources, the defendant should be confronted and asked to resolve the contradictions.[34] Psychiatric and physical examinations may be part of the investigation.[35]

The sentencing judge typically relies heavily on the PSI. He does, however, have other input. Educated by the PSI, he conducts a sentencing hearing. At the hearing, counsel has an opportunity to speak on behalf of the defendant, and the defendant may speak on his own behalf.[36] The prosecutor may in some cases, but usually does not, comment prior to sentencing; most courts rely on the recommendations of the probation officer, serving as an arm of the court, in preference to the prosecutor.[37] In addition, the judge may seek more detailed information by committing the defendant to the custody of the Attorney General for a study of his social background, mental and physical health, and other pertinent factors. 18 U.S.C. §§ 4205(c) and (d) (1976). The resulting report is prepared under the supervision of the Director of the Bureau of Prisons and furnished to the court. *Id.* Thus, in the typical case, the judge fashions a sentence based on the PSI, glossed by the defendant's presentation at the sentencing hearing, by national sentencing objectives and policies, see p. 488 *supra*, and, possibly, by the section 4205(d) report.

Like the sentencing judge, the Parole Commission relies heavily on the PSI. The PSI is the foundation of the initial parole decision, which normally precedes the accumulation of significant data about institutional adjustment, prognosis for rehabilitation and the like.[38] In almost every parole decision, though, the PSI is an important instrument, so that the probation officer who prepares it performs an equivalent service for the Commission as for the sentencing judge. See note 26, *supra.*

Like the judge, the Commission has other input. The sentencing judge may transmit to the Commission a form A.O. 235, Report on Sentenced Offender by United States District Judge. On the form, the judge states the intent or purpose of the sentence imposed; the court's opinion of any treatment or training suitable for the offender; the appropriateness of parole in view of the offense, prior criminal background, and any mitigating or aggravating circumstances; and recommended institution. Similarly, the prosecutor may complete a form USA–792, Report on Convicted Prisoner by United States Attorney. This report, which is available to the Parole Commission, asks for a full account of the offense and whether the defendant was of assistance to the government and, in an optional section, the prosecutor's parole recommendation.

The Commission also has available information generated by the Bureau of Prisons. This includes the so-called Classification Study conducted pursuant to 18 U.S.C. § 4205(d) (1976). The Classification Study is likely to reiterate substantially the PSI, though it may supplement the contents of that report. In addition, for parole applications considered after the initial 120-day period, the Bureau of Prisons provides progress reports based on the prisoner's behavior in prison, response to treatment, and the like.

---

**33.** *Probation Manual,* note 30 *supra,* §§ 2102, 2107–2110, 2113–2114.

**34.** *Id.* § 2003.

**35.** *Id.* §§ 2111–2112.

**36.** Fed.R.Crim.P. 32(a)(1).

**37.** Hoffman, *Conducting the Sentencing Hearing,* in Seminars for Newly Appointed United States District Judges 326, 327–28 (1971).

**38.** Indeed, the initial parole decision rests on virtually the same factual base as the judge's sentencing decision.

Finally, like the judge at the sentencing hearing, the hearing examiners entertain the presentation of the prisoner and his designated representative at the parole hearing. 28 C.F.R. § 2.13 (1980). Insofar as he gathers and transmits information in the form of Classification Studies, progress reports, and prisoner input, the hearing examiner functions much as would a probation officer supplementing the PSI for the sentencing judge or the Parole Commission.

In summary, the sentencing judge and the Parole Commission perform equivalent functions in parallel fashion. Both ground their decisions in data provided by equivalent, or identical, support services. Both make discretionary determinations influenced by national correctional policies enunciated by Congress. Both determine when convicted offenders will return from prison into society.

### D.

Thomas Warren Whisenhant was alleged to be at large on October 16, 1976, and therefore able to murder appellants' decedent, because of the Parole Board's decision. He might equally have been at large on that date because of the length of sentence imposed by the district judge or, in another case, because of the judge's decision to place him on probation, or because of the conditions of probation.

The majority holds that the victim of a parolee's crime states a claim within the jurisdictional grant of the Federal Tort Claims Act by alleging that the Bureau of Prisons negligently performed acts antecedent to the parole decision, and opines in dictum that a complaint unambiguously alleging the Parole Board's breach of a duty antecedent to its exercise of discretion states a like claim. Implicit in the majority's analysis is the application of its holding to the sentencing decision by the district judge. No less than the parole decision, the

sentencing decision rests on antecedent acts, equally "ministerial," performed by information-gathering and -transmitting support agencies. From the majority's holding *at least* these analogues necessarily follow: the victim of a probationer's crime states a claim within the jurisdictional grant of the Federal Tort Claims Act by alleging that the court's probation officer negligently performed acts antecedent to the sentencing decision; the victim of the crime of an offender sentenced to less than the maximum term of imprisonment states a claim within the jurisdictional grant of the Federal Tort Claims Act by alleging that the court's probation officer negligently performed acts antecedent to the sentencing decision.[39]

Because of the known probability of recidivism, every time a judge places an offender on probation or imposes a term of imprisonment less than the maximum, he creates the possibility that "because of" his decision, the offender may commit a serious crime. It is difficult to imagine a sentence or a parole decision which could not be challenged indirectly, like Whisenhant's, by allegations that it rested on data that was inadequate because negligently gleaned or transmitted. We can expect allegations that the probation officer failed, through negligence, to uncover significant core information (employment history, psychiatric history, military record) which would foreseeably influence the sentencing or parole decision; that he failed to independently verify representations made by the offender and therefore relied on misinformation in arriving at a sentencing recommendation; that he failed to record and report data provided by those with whom he consulted in preparing the presentence investigation report. It will be alleged that the Parole Commission made the wrong decision because the Bureau of Prisons failed to report an infraction by the prisoner; that the pro-

---

**39.** The portions of the majority opinion which sustain jurisdiction concern acts which the majority concludes are mandated by statute or regulation. See majority opinion op. at pp. 482–83. This, it should be noted, does not limit the scope of the majority's holding, since acts may be nondiscretionary even though not required by statute or regulation.

bation service misadvised the sentencing court and the Parole Commission about the offender's criminal record because of an F.B.I. computer programmer's error; that the prisoner was paroled too soon because the hearing examiner lost the prosecutor's form USA-792.[40] And every such allegation will diminish the effectiveness of the ultimate decision maker in the ways Congress sought to forestall when it enacted the discretionary function exception.

Today's decision threatens substantial damage to our correctional system. During the twelve month period ended June 30, 1981, federal district courts sentenced 29,-868 convicted defendants. Of these, 12,173 were placed on probation.[41] A large but indeterminate portion of those who were sentenced to prison received less than the maximum sentence.[42] During the same period, 6,452 persons began a term of parole.[43] In preparation for sentencing and parole decisions, probation officers conducted 24,-957 presentence investigations.[44]

During the same twelve month period, 652 persons were removed from federal parole because of their involvement in a new major offense; 647 were removed from probation to a United States District Court or to a United States Magistrate for the same reason.[45] These latter figures are particularly suggestive of the number of lawsuits against the government sanctioned by today's decision.[46] Under today's decision we can expect a barrage of claims by victims of parolees, probationers, and offenders sentenced to less than the maximum term, all of them alleging that the wrong sentencing or parole decision was made because of a failure on the part of a government agent in a position to affect those decisions. Each such lawsuit will not only be financially

costly to the United States but will also present an occasion for haling a sentencing judge or a Parole Commissioner into court to explain his decision. Certainly Congress did not contemplate this result when it enacted the Federal Tort Claims Act. And indeed, if our overburdened system of criminal justice administration is to be required to bear the cost in time, money and performance that litigation such as this case threatens, it should be by congressional enactment and not by judicial decision. I dissent.

FAY, Circuit Judge, joined by HENDERSON and THOMAS A. CLARK, Circuit Judges, concurring in part and dissenting in part:

Most respectfully, I join in those portions of Judge Hatchett's opinion which reverse the trial court and dissent from those portions which affirm the trial court. As author of the panel opinion, 636 F.2d 132, I tried to present a full analysis of both the legislative history and judicial precedent surrounding the issues presented. Nothing submitted during the en banc consideration of this case has altered my views expressed at that time. It is most appropriate that the case will now proceed to a full development of the facts leading up to and surrounding the release of Thomas Warren Whisenhant.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

I concur except in Part III. I agree that the allegation of failure to give adequate consideration to records does not state a cause of action. But I would hold that the

---

40. See p. 491, *supra*.

41. Administrative Office of the United States Courts, *Annual Report of the Director*, Table 46, p. 101. (1981)

42. 13,700 were sentenced to imprisonment. Of these, 4,301 received split or indeterminate sentences. *Id.* Of those who received a regular sentence, it can be assumed that many received less than the maximum term.

43. *Id.*, Table 15, p. 13.

44. *Id.*, Table 16, p. 14.

45. *Id.*, Table E-7, p. A-117.

46. Admittedly, these figures are no more than suggestive. They include persons whose major offenses were victimless and therefore could not be the basis of a suit like this one. On the other hand, they exclude persons previously removed from parole or probation and then reinstated. Furthermore, these figures do not account for persons at large because of original sentences less than the maximum.

allegation of failure of the board to acquire and read reports does state a cause of action sufficient to withstand a motion to dismiss.

THOMAS A. CLARK, Circuit Judge, concurring in part and dissenting in part:

I join in Judge Fay's concurrence. However, I would decide the "discretionary function" issue after trial as a matter of determining liability, not jurisdiction. 28 U.S.C. § 1346(b) provides jurisdiction in Federal Tort Claims Act cases. If the governmental function is a discretionary one, there is no liability due to the language of the Act. Judge Tjoflat's discussion in his dissent is very learned and helpful. However, I would first want to know how Whisenhant, an established homicidal psychotic, happened to be given the opportunity to be in Mobile in 1975 and 1976 when he killed and mutilated the three women. I do not see how one decides whether the circumstances leading to his release constituted a "discretionary function" without a factual judicial inquiry. Such a judgment call should not be based merely on what is in a complaint.